**Marvin S. MARTIN, Plaintiff-Appellant,**

v.

**Dr. Gene P. BARBOUR and Dr. E. W. Egle, Defendants-Respondents.**

**No. 37650.**

Missouri Court of Appeals, St. Louis District, Division Four.

July 5, 1977.

Motion for Rehearing and/or Transfer Denied Sept. 12, 1977.

Application to Transfer Denied Oct. 11, 1977.

202

Frank B. Green, Charles A. Mogab, Morris A. Shenker and Cordell Siegel, St. Louis, for plaintiff-appellant.

Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, John J. Horgan, Hullverson, Hullverson & Frank, Inc., Thomas C. Hullverson, Stephen H. Ringkamp, St. Louis, for defendants-respondents.

NORWIN D. HOUSER, Special Judge.

Nine jurors returned a verdict for $125,000 in favor of Marvin S. Martin in his suit against Drs. Gene P. Barbour and E. W. Egle based on charges of negligent operation and treatment for a rectal condition allegedly resulting in chronic and permanent incontinence. Defendants filed a motion to set aside the verdict and render judgment in accordance with their motions for directed verdicts at the close of all the evidence, or in the alternative for a new trial. The circuit court sustained the motion and entered judgment for defendants, or in the alternative sustained their motion for a new trial. Plaintiff has appealed, praying for reversal of the order and entry of judgment for plaintiff for $125,000 in accordance with the verdict.

Plaintiff went to the jury on the theory that in the course of surgical procedures performed by defendant Barbour plaintiff's internal sphincter muscle was damaged when it was not medically necessary to do so.

■ The first issue on appeal is whether plaintiff adduced sufficient evidence to make a submissible case on the issues of negligence and proximate cause. In making this determination we view the evidence in the light most favorable to plaintiff, giving him the benefit of all favorable inferences and disregarding defendants' evidence except insofar as it may favor plaintiff. *Swope v. Printz*, 468 S.W.2d 34, 37 (Mo.1971).

■ The term "negligence" in this case means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendants' profession. The parties agree this is the standard of care required of the surgeon performing surgery on plaintiff's rectum. More particularly, the initial question is whether the surgeon negligently cut or damaged plaintiff's internal sphincter muscle and if so whether the muscle was cut deeply enough or sufficiently to cause injury to plaintiff.

Plaintiff, having suffered for several weeks from stomach pains, first consulted Dr. Barbour on January 20, 1970. Suspecting stomach ulcer, Dr. Barbour placed plaintiff in Normandy Osteopathic Hospital for tests. After taking X rays and making other tests Dr. Barbour, an expert in the field of proctology, examined plaintiff's rectum. None of plaintiff's complaints was associated with his rectum. Plaintiff had never previously made any complaint with respect to or sustained any injury to or experienced any disease or treatment of any kind to his rectum. He did not complain of painful bowel movements in his interview with doctors at the hospital. Dr. Barbour tried to insert an examining pipe into plaintiff's rectum. He reported to plaintiff that he was unable to do so; that he found some sort of blockage in his rectum which would have to be opened up; that otherwise it would close; that if it closed all the way it would be "like locked bowels" and this would kill him; that surgery "had to be done." Dr. Barbour did not explain to plaintiff what surgery he proposed to perform; did not tell him he had hemorrhoids and a fissure; did not discuss the risks involved, the possibility of having

the sphincter muscle cut or damaged, that if it were cut plaintiff might be incontinent, or that the operation might not be 100% successful. Having confidence in the doctor, plaintiff submitted to surgery on February 3, 1970. Following surgery his rectum was tight (a condition termed "stenosis"). After the operation he was examined weekly, either by Dr. Barbour or Dr. Egle, at their offices, and treated by digital dilation of the rectum and attempts to stretch the opening with an instrument. Dr. Barbour finally advised a second operation. No mention was made of any dangers or risks involved in the second surgery. Trusting the doctor, plaintiff was operated on a second time on April 16, 1970. Following the second surgery plaintiff could no longer control his bowels; he was incontinent.

Plaintiff worked at General Motors for several years prior to January 28, 1970, on which date he took sick leave to enter the hospital. Off work continuously until December 11, 1970, plaintiff drew sick leave benefits. Plaintiff was required to submit to examination by the insurer's physician, a Dr. Richard Huck, for verification of disability. In July, 1970, Dr. Huck examined plaintiff digitally and with a "shiny tube." He advised plaintiff that he thought the operation would have to be "all done over again," but if it was his (the doctor's) "rear end" he would have a specialist do it. Plaintiff did not understand the significance of what Dr. Huck was telling him because he thought he had been going to a specialist, and he had no suspicion at that time and no idea that there was any basis for criticism of Drs. Barbour and Egle. Dr. Huck made a report to the insurance company, the contents of which were not disclosed to plaintiff. In October, 1970 plaintiff asked either Dr. Barbour or Dr. Egle if he would have to have the work all done over again. The doctor advised plaintiff to exercise the muscles down there, which plaintiff had been doing but exercise did not seem to be working. Plaintiff decided to do something about his situation. In October, 1970 he called Dr. Huck for a recommendation of another doctor. Dr. Leo J. LeBlanc, a proctologist, was recom-

mended. Plaintiff first saw Dr. LeBlanc November 23, 1970, complaining of lack of control over his bowels, leakage, and having stools in his shorts. The first time plaintiff came to personal knowledge that he had sustained some injury in surgery was when he went to see Dr. LeBlanc on November 23, 1970. On that date Dr. LeBlanc told him that the muscle had been cut. Following the examination Dr. LeBlanc advised plaintiff there was an operation that could be performed, to try to pull the muscles back together; that he had performed the operation many times; that sometimes people get back quite a bit of muscle control, and others do not. Plaintiff decided against an operation at that time and resumed work at General Motors December 12, 1970. He worked for several months. On July 11, 1971, unable to do the work satisfactorily because of his rectal problem, plaintiff took sick leave. Plaintiff then returned to Dr. LeBlanc in the hope that repairs could be made to enable him to regain some control and go back to work. Dr. LeBlanc operated on plaintiff on July 16, 1971. The operation was unsuccessful. Plaintiff returned to work September 14 and worked until October 20, 1971, when he finally quit work for good, classified permanent total disability by Social Security and under the General Motors Retirement Plan. Plaintiff moved to Arizona, where on November 16, 1973 he submitted to an examination by Dr. Joseph McAndrew to verify his disability. Plaintiff filed suit for malpractice on September 6, 1972.

Dr. Barbour's operative report of the first operation shows a diagnosis of internal and external hemorrhoids, multiple cryptitis, posterior fissure in ano with anal stenosis, and rectomembranous prolapse, Grade III. The operation performed was Ano Proctoplasty (Internal, External Hemorrhoidectomy, Multiple Cryptectomy, Posterior Fissurectomy, with Anotomy for relief of anal stenosis, and plastic repair of rectomembranous prolapse, Grade III).

To make a submissible case of negligent malpractice and proximate cause the burden was on plaintiff to prove (1) that dur-

ing the surgical procedures performed by Dr. Barbour plaintiff's internal sphincter muscle was damaged; (2) that it was not medically necessary to damage that muscle in performing the surgery; (3) that damaging the internal sphincter muscle in the course of performing the surgery constituted a failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendants' profession, and (4) that damaging the internal sphincter muscle caused plaintiff to be incontinent.

(1) Was plaintiff's internal sphincter muscle damaged?

■ The sphincter muscle has three branches. Dr. LeBlanc testified that the sphincter muscle has to be "pretty well damaged in its three branches" before the result is no control (over bowel discharge). Some surgeons cut the muscle, but only the top branch of the muscle, which is done to defer healing—so healing will begin inside and come outside rather than form a pocket. There is evidence by way of admissions made by Dr. Barbour in the hospital records, and by his counsel in opening statement, that in fact he cut the sphincter muscle during the first operation. The hospital records relating to the second operation contain an admitting note over Dr. Barbour's signature in which, after reciting that the patient had marked postoperative anal stenosis, Dr. Barbour wrote: "At the time of his first surgery division of the sphincter muscle at the posterior midline was accomplished, apparently inadequately because the patient still has too much stenosis." Dr. LeBlanc testified that this quotation means that the muscle was severed.

Dr. Barbour testified that during the first operation, in order to relieve the stenosis and open up the canal "so you can get proper things to go through," he inserted a speculum and took a scalpel and "divided down through the scar tissue, and whatever muscle was involved in that. I don't always report this subcutaneous external sphincter muscle that is scarred up, you go through it. When you have one that needs to be gone

through, you just go through that." He testified that "some people" feel the external sphincter muscle must be divided in order to do an adequate fissurectomy "and if you have got a stenosis, you must divide the subcutaneous external sphincter muscle"; that he could not really tell whether he did it completely or not. "I did some, because in an anal stenosis that muscle is shallow, it's not terribly deep. I may have divided that muscle. I can't really tell you." On cross-examination Dr. Barbour stated that when you are doing the stenosis "you have also got to get probably into some of these subcutaneous sphincter muscles." Questioned whether he divided the external sphincter muscle he answered, "Not the whole one. I'm not sure, I don't believe, I say." Asked if *in his report* he mentioned cutting into the internal or external sphincter muscle, Dr. Barbour answered, "No, sir. I did not. However, that is a routine kind of operation which I suppose maybe I should record if I'm talking about the subcutaneous portion of the external sphincter muscle. I don't necessarily record that. I do say in this operative report that I Marsupialized the wound edges, which makes me think I probably did do a sphincter incision in the subcutaneous external sphincter muscle, because if you are really scarred up and really tight, you don't want the patient to seal up again. And, very often I will make an incision in that muscle and Marsupialize it down, or sew it down rather than bring it straight back together." Further, "Q. Now, there is no mention in that report of your going into the internal or external sphincter muscle or cutting into that muscle, but, now, you say, you may have? A. I say, I probably did, the external subcutaneous sphincter muscle, and I say, since I Marsupialized it, I probably incised it, but I can't tell you that for sure. Q. When you say you incised it, that means cut? A. Yes, sir. Q. And that the depth of the cut at this time you couldn't tell us— A. You mean— Q. (continuing)—from your personal recollection or from any note that you made at the time? A. I will say that I could have cut through the entire subcutaneous external sphincter muscle."

In defendants' opening statement counsel stated that the evidence would show that "the sphincter muscle was cut."

Plaintiff testified that at his first examination by Dr. LeBlanc on November 23, 1970 Dr. LeBlanc told him the sphincter muscle had been cut. That this happened is borne out by what Dr. LeBlanc found when he operated. There was a deficiency in the sphincter muscle of about one inch. Using forceps he "fished" in the tissue for the ends of the muscle, which were separated and retracted in the tissue. He "found two ends of the muscle" and "pulled them together," threading them with a piece of wire later removed and making the repair with catgut. Unfortunately the ends did not reunite and the operation was unsuccessful.

With respect to the second operation there is direct evidence by way of an admission that Dr. Barbour cut deep *to* the internal sphincter muscle. In his operative report on the second surgery Dr. Barbour stated: "A Brinkerhoff speculum was introduced into the anus and scar tissue at the posterior midline was excised. * * * The incision was deep to the superficial fibers of the external sphincter muscle and the internal sphincter muscle. * * * An incision was also made at the lateral midline on both the right and left side deep to the superficial fibers of the internal and external sphincter musculature." The report went on to say that it was not necessary to incise any fibers of the muscle; that the scar tissue excised lay above the muscle, and that the muscle was found to be in good condition. Dr. Barbour testified that he shouldn't have said what he said in the last quoted sentence; that he did not mean the whole sphincter; that "we are doing these things all the time, and you go in and make a dictation, * * * and you are kind of hurrying"—that paper work is one of your biggest headaches; that he said sphincter because it "is a common procedure to me to cut the external subcutaneous sphincter. I do not as common procedure cut the whole sphincter, I—so, I reported there what I shouldn't have said." When asked if there was any way of knowing how

deep the incision went in the second operation Dr. Barbour answered that he could tell about his procedures in general; that he always goes as far as the scar tissue goes. In reviewing his operative report Dr. Barbour said, " * * * I assume I did not cut the fibers in there. It's probably a little bit impossible not to cut any, but I said I didn't cut any." After extensive cross-examination Dr. Barbour admitted the possibility that "the lower border of the internal sphincter muscle might have been incised."

In addition to the admissions of Dr. Barbour there is circumstantial evidence that the internal sphincter muscle was cut. Dr. LeBlanc testified that if Dr. Barbour "just cut the top branch, I think, nothing would have happened"; that if plaintiff was not incontinent after the first operation and was incontinent after the second, the conclusion is that the muscle was not cut in depth in the first operation sufficiently to make him incontinent.

Following Dr. Huck's examination of plaintiff Dr. Huck made the diagnosis: "Rectal incontinence secondary to division of rectal sphincter," by which he meant "that the sphincter was cut." From the patient's history of inability to control his bowels following rectal surgery the "logical conclusion" in the doctor's thinking was that the patient must have had his sphincter muscle cut.

From all of the foregoing the jury could find and believe that in the course of the first operation Dr. Barbour cut through the entire exterior sphincter muscle to relieve the stenosis; that Dr. Barbour considered such cutting routine and did not include it in his operative report; that the division of the muscle during the first operation was inadequate to properly relieve the tightened condition of the anus and a second operation became necessary; that in the course of the second operation further cutting was done to relieve the stenosis; that incisions made in the course of the two operations effected a separation of the sphincter muscle; that the two ends of the muscle retracted; that in his attempt in the second

operation to further relieve the condition of stenosis Dr. Barbour cut deeper than he intended. The jury was not required to accept and evidently rejected Dr. Barbour's sometimes conflicting testimony with respect to whether he cut various branches of the sphincter muscle and if so the extent to which the sphincter muscle was incised. The jury could and evidently did find that the internal sphincter muscle was incised by Dr. Barbour and incised deeply enough to injure and damage plaintiff.

(2) Necessity of damaging the muscle in performing this surgery?

■ Dr. Barbour testified that in performing a simple hemorrhoidectomy there is no cutting or tampering with the internal or external sphincters if the surgery is properly done, and that any cutting on the sphincter muscle in such an operation would be improper. The same is true of a multiple cryptectomy. He agreed that surgical damage to the anal rectal sphincter muscle is not a common and ordinary incident of anal rectal surgery; that it was not necessary to traumatize the rectal sphincter muscle for the operations performed—not necessary to incise the muscles further than the extent of the scar tissue. Asked "Was it medically necessary at all to cut into the internal sphincter muscle in any of your operations you performed?" Dr. Barbour answered, "I don't believe so."

Dr. LeBlanc testified that in doing a cryptectomy, hemorrhoidectomy and fissurectomy it is not necessary to cut on the muscle; that "you do your dissecting down to the muscle."

From the medical evidence, including the admissions of Dr. Barbour, the jury had ample evidence to find that there was no necessity of damaging the sphincter muscle in performing this surgery.

(3) Did the damaging of the muscle constitute a failure to meet the required standard of care?

■ Dr. Huck testified that the total, unintended, accidental cutting of the sphincter muscle when it is not necessary to cut is not good medical practice.

Dr. LeBlanc testified that the unintended cutting of the sphincter muscle for reasons that are not medically necessary constitutes a failure to exercise the reasonable medical care (that degree of care other surgeons use); that he was familiar with what good medical practice is in this regard and it is not good surgical practice to cut the whole sphincter muscle without medical indication or medical basis for cutting the muscle.

Dr. Joseph McAndrew agreed that the unintentional cutting of a sphincter muscle in performing rectal surgery would be a failure to exercise that degree of care, skill and competence that other physicians would exercise. From his examination of plaintiff and his findings of scar tissue and incompetent anal sphincter he would say that "whatever surgery took place there, fell beneath the care ordinarily exercised by rectal surgeons."

From this evidence the court could find an affirmative answer to the question propounded in (3).

(4) Did the damage to plaintiff's sphincter cause incontinence?

■ Defendants' counsel conceded in his opening statement that plaintiff has "mild" incontinency and in their brief agree he has "some degree of incontinence" but they contend there was no expert medical testimony that the incontinence results from damage to plaintiff's sphincter muscle.

Dr. Huck's diagnosis was "Rectal incontinence secondary to division of rectal sphincter." The word "secondary" means dependent or consequent on, as used here, and this diagnosis tends to prove causal connection.

Dr. LeBlanc's testimony reveals his conclusion that plaintiff had an incontinent rectal sphincter resulting from previous surgery. Dr. LeBlanc testified that plaintiff gave him a history of bowel control before surgery and no control after surgery; that he examined him, and upon digital insertion in his rectum plaintiff was unable to tighten up and squeeze the doctor's finger; that this "tells you something

has happened here." He put it this way: "I don't know how to phrase it any other way with the history of surgery and the patient tells you that he had control before surgery, and, now, he doesn't. * * * If he tells you that he doesn't have any control now, and you examine him and you find what I found, I only had one conclusion to draw that something happened there." Before examining Dr. Barbour's notation in the hospital record (admitting division of the sphincter muscle) Dr. LeBlanc testified that he was not present at the operation and did not know what happened there—didn't know whether the muscle was damaged with a clamp, whether he was cut, or had an abscess. After seeing Dr. Barbour's written admission, however, Dr. LeBlanc testified this meant the muscle was severed; that "He admits it here. It's not my doing. It's written here"; that if the severance of the muscle had been repaired immediately plaintiff would have had a better chance of making a full recovery, but that by the time Dr. LeBlanc "got him" the muscle had atrophied; that during the operation he performed Dr. LeBlanc "fished" for the two separated ends of the muscle; that it is a matter of judgment how deep a surgeon should go in the removal of scar tissue; that "the thing is the depth of the cut, and if you don't know how deep to cut it, don't cut it"; that if a surgeon knows where he is putting his knife and incontinence happens, the surgeon doesn't know his anatomy. Dr. LeBlanc referred in his testimony to a report he signed for insurance purposes, reciting that "Physical exam reveals incontinent rectal muscle," and ruled out all other causes of plaintiff's incontinence. He reviewed the X-ray reports and hospital records and testified that there was nothing in the hospital findings (with reference to colitis, gastritis, duodenitis, hyperactive intestine or other upper G.I. diagnoses) to account for the man being incontinent, other than the finding he made of damage to the anal rectal sphincter muscle.

We find proof of causation sufficient to submit the case to the jury.

Plaintiff's case against Dr. Egle, who did not assist or participate in either of the operations performed by Dr. Barbour and did not consult or treat plaintiff until after the operations, is based upon the contention that the two doctors were partners acting concurrently in treating plaintiff. There was evidence that on January 20, 1970 they were partners, but that at the time of the trial Lackland Clinic, owned by defendants, was a corporation. There is no evidence to show if and when the partnership was dissolved or when Lackland Clinic was incorporated. Plaintiff claims it is immaterial whether defendants treated him as partners or as coemployees of a corporation, in view of the evidence patients are seen back and forth between the two doctors; that patients know that either one or both of the doctors will see them, and that both doctors make notations on the file cards of patients and all their records show entries either by Dr. Barbour or Dr. Egle, or both. Conceding that under *Telaneus v. Simpson*, 321 Mo. 724, 12 S.W.2d 920 (1928), the negligence of Dr. Barbour in surgery could be imputed to Dr. Egle, if defendants were partners during the entire course of plaintiff's treatment, defendants say there was no evidence that defendants were partners beyond January, 1970. Further conceding that under *Baird v. National Health Foundation*, 235 Mo.App. 594, 144 S.W.2d 850 (1940), defendants would be jointly liable as employees of a common employer if they were acting concurrently in treatment of plaintiff which caused him injury, defendants say they were not acting concurrently on February 3 and April 16, the only dates or occurrences upon which negligence was charged; that since there was no charge of negligence with respect to postoperative care, plaintiff failed to make a case against Dr. Egle on the issue of concurrent treatment. Defendants further contend that any fraudulent concealment by Dr. Barbour constituted a wrongful act outside the scope of the partnership business, which could not be imputed to Dr. Egle, and therefore the statute of limitations as to the vicarious liability of Dr. Egle expired before suit was filed.

■ Having proved that a partnership between the two doctors existed in January, 1970 an inference arises that the partnership continued to exist until the corporate form of practicing medicine was adopted. *Martin v. Sloan*, 377 S.W.2d 252, 256–257 (Mo.1964). The only evidence with respect to the corporate existence shows it in existence at trial time. There is no evidence that the corporation was in existence at any time prior to the filing of this lawsuit. For defendants to take the position that the law of partnership does not apply the burden was theirs to demonstrate when the partnership terminated. This they failed to do. "Pursuant to general rules, partners in the practice of medicine are all liable for an injury to a patient resulting from the lack of skill or the negligence, either in omission or commission, of any one of the partners within the scope of their partnership business; * * *." 70 C.J.S. Physicians and Surgeons § 54b., p. 977. "And where several physicians are in partnership, they may be held liable in damages for the professional negligence of one of the firm." 60 Am.Jur.2d Partnership § 166, p. 86. "It is plain, too, that when physicians and surgeons are in partnership, all are liable in damages for the professional negligence of one of the firm, for the act of one, within the scope of the partnership business, is the act of each and all, as fully as if each is present, participating in all that is done." 61 Am.Jur.2d Physicians, Surgeons, Etc. § 166, p. 295. And see Anno: 85 A.L.R.2d 889. On this record Dr. Egle is liable for Dr. Barbour's professional negligence on the basis of their partnership. There is no merit in the contention that fraudulent concealment by one partner may not be imputed to another partner. "The individual partners * * * are liable in a civil action for the fraudulent misconduct of a partner within the course or scope of the transactions and business of the partnership, whether such misconduct be by fraudulent representations or otherwise, even though the copartners had no knowledge of the fraud and did not participate therein; * * *." 68 C.J.S. Partnership § 170, p. 620; *Kearns v. Sparks*, 260 S.W.2d 353, 360[15] (Mo.App.1953).

The next question for determination is whether plaintiff is barred by the 2-year statute of limitations applicable to actions for malpractice (§ 516.140, RSMo 1969). The acts of alleged negligence occurred on February 3 and April 16, 1970. Suit was filed September 6, 1972.

■ Section 516.280, RSMo 1969 provides: "If any person * * * by any * * * improper act, prevent the commencement of an action, such action may be commenced within the time herein limited, after the commencement of such action shall have ceased to be so prevented." For plaintiff to submit fraudulent concealment under § 516.280 in avoidance of the 2-year limitation period he must have proved (1) that in performing the surgeries Dr. Barbour did or failed to do something which caused the incontinence; (2) that Dr. Barbour's conduct failed to meet the required standards of professional competence and therefore constituted negligence; (3) that Dr. Barbour had actual knowledge that he caused the incontinence; (4) that with that knowledge Dr. Barbour intended by his postoperative conduct and statements to conceal from plaintiff the fact that he had a claim against him for malpractice by reason thereof; (5) that Dr. Barbour's acts were fraudulent, and (6) that plaintiff was not guilty of any lack of diligence in not sooner ascertaining the truth with respect to his situation. *Swope v. Printz*, supra, 468 S.W.2d l.c. 38–39.

Under our previous analysis (1) and (2) were satisfied.

■ As to (3): Dr. Barbour testified that he cut the external sphincter muscle, perhaps through the entire muscle. He admitted that he might have excised the internal sphincter muscle. For the sphincter muscle to have no tone as a result of surgery it would be necessary for the muscle to have been considerably damaged in all three of its branches, according to Dr. LeBlanc. Only Dr. Barbour had personal knowledge of how deeply he cut but the stark fact for the jury to consider was that

prior to the cutting the muscle was working but afterwards it was incompetent, as testified to by Drs. LeBlanc, and McAndrew, whose digital examinations revealed that plaintiff was unable to contract or draw up the muscle. After only one routine office examination it was apparent to these two doctors that the muscle was affected and that the incontinence resulted from the surgery. Although Dr. Huck did not remember having made a digital examination it was his opinion that the incontinence resulted from the surgery. The jury could find that the true cause of plaintiff's incontinence, so readily apparent to three disinterested doctors, was equally apparent to Drs. Barbour and Egle, eminent proctologists with wide experience in the field—professed experts fully acquainted with the surgery performed and intimately acquainted with plaintiff's condition both before and after the surgery; could find that Dr. Barbour had actual knowledge not only that he cut and unintentionally cut too deeply but also that he knew his surgeries had caused the incontinence.

On (4) and (5)—fraudulent concealment—a submissible case was made. Plaintiff is not a highly educated person. His formal education consisted of eight years of grade school and four years of night school training in machine shop work. He had no information on matters of this nature. He did not know of his own knowledge how long it took "for anything like this to get well." While in the hospital, immediately after the second operation, plaintiff found himself incontinent. After leaving the hospital and during the weekly visits to Lackland Clinic plaintiff questioned Dr. Barbour concerning his inability to control his bowels. A fiduciary relationship of a highly confidential nature existed between plaintiff and Drs. Barbour and Egle, imposing upon them the duty to disclose known material facts to plaintiff. The jury found that defendants knew the sphincter muscle had been negligently damaged in the operative procedures. With that knowledge it was defendants' duty to disclose this important fact to plaintiff. The jury could find not only failure to disclose—complete silence on the subject—but also affirmative misrepresentation of the situation by repeated assurance that the rectum was in good condition and attributing his condition to chronic colitis. Plaintiff had a right to and the jury could find that plaintiff did in fact rely upon, trust and believe defendants and their representations and advices; that he had implicit confidence in them. When plaintiff interrogated Dr. Barbour about his condition Dr. Barbour told him it would take a long time before his bowels would start working right; to keep exercising his muscles down there; and assured him that it would take quite a long while before his bowels would start functioning normally. Plaintiff asked what he meant by a long time and Dr. Barbour answered, "A year or more." On August 4, 1970 Dr. Egle told plaintiff that his rectum was doing fine and it was explained to plaintiff that he had a chronic condition of colitis. On August 22, 1970 Dr. Egle wrote in his notes and told plaintiff his rectum was fine and all healed. Defendants kept telling plaintiff that he was improving and that his anal rectal ring was intact. (The anal rectal ring is not the same as the anal sphincter muscle; the anal rectal ring was not involved in any manner.) On September 19, 1970 Dr. Egle wrote in his notes: "Rectum perfect—sphincter good." Following Dr. Huck's examination, and in October, 1970 plaintiff questioned defendants about his progress and whether he would have to have the surgery done over again. He was told to exercise his muscles. Plaintiff told the doctor that the exercise "didn't seem to be working," whereupon the doctor slapped him on the back and said, "You have got better muscles than I have down there." Dr. Egle recorded that his rectum was perfect; that he had good functional bowel syndrome and that on digital examination he found good tone in the sphincter muscle. On October 17, 1970 this notation appears: "Rectum healed * * * Sphincter excellent," and advised plaintiff he could return to work.

The jury could find that these record entries, misrepresentations and reassuranc-

es given plaintiff, made in the face of plaintiff's contrary experience and diametrically opposite to the findings of disinterested medical practitioners were falsely and fraudulently made; that they were made with intent to deceive plaintiff and conceal the true fact that he had been negligently damaged and made permanently incontinent by the surgeries.

█ (6) Whether plaintiff was not diligent in sooner ascertaining the truth was a jury question. From the date of his second operation until November 23, 1970, when for the first time he learned that his sphincter muscle had been cut, plaintiff received repeated assurances from defendants that he was improving; that he had chronic colitis to account for his loose bowels, and that it would take a long time—a year or longer—before his bowels would be working normally. As indicated, there was ample evidence of reliance by plaintiff upon the advices of these rectal specialists, who did not tell him his sphincter muscle had been severed. Dr. Huck, who examined plaintiff in July, did not inform him of this fact, although Dr. Huck did alert plaintiff sufficiently to cause him to seek further medical advice. In November, 1970 he for the first time learned that his sphincter muscle had been damaged, and he filed suit within two years after gaining that knowledge. Because of the pain and previous experience plaintiff did not undergo a third operation immediately after November 23, 1970. Instead, he went back to work. He wanted "to think it over and give it more time, maybe they would start working again." Plaintiff pursued his employment until it became evident that his condition would not permit him to work any longer. Even then he clung to the hope that his condition would eventually get better, a hope fed by defendants. The jury could find that plaintiff was not guilty of lack of diligence in not sooner ascertaining the truth of his condition.

In the alternative order directing a new trial the circuit court sustained every one of the seventeen assignments of error in giving Instruction No. 4 (plaintiff's main ver-

dict director). We have read and considered each of the seventeen assignments of error which were sustained in this wholesale fashion and we find no merit in any of them. Many of the criticisms relate to claimed lack of evidence in the same respects complained of as failure to make a submissible case, which we have disposed of adversely to defendants. None of them is of sufficient value as a precedent to justify a seriatim treatment in this already too long opinion. Instruction No. 4 is MAI No. 21.01 properly modified to incorporate the factor of fraudulent concealment. It is simple, brief, impartial, free from argument, does not require findings of detailed evidentiary facts and properly submitted the issues tried.

█ Defendants assign as an additional reason why they are entitled to a new trial that Dr. Barbour was improperly cross-examined by use of certain medical textbooks, because they were not sufficiently identified. (Counsel for plaintiff merely stated that the books were from the Washington University Medical School Library.) That objection was not made at trial. Defendants' counsel then objected "to that as not for cross-examination." This general and obscure objection was insufficient to raise the point now pressed. *Galloway v. Galloway*, 169 S.W.2d 883, 887 (Mo.1943). In any event, no prejudice is shown. The witness was in basic agreement with the quotations from the books which were read to him.

Defendants further contend that the new trial order was justified for error in allowing personnel from the disability benefits insurance company and General Motors to testify that plaintiff was totally disabled according to their business files; that this testimony was hearsay upon hearsay and inadmissible under the Business Records Act.

█ Mr. Adams, an employee of General Motors, whose duty as an adjuster was to review and evaluate employees' claims for disability benefits under the company's insurance policy with Metropolitan Life Insurance Company, and to authorize payments, testified that the criterion for

payment was that of total disability. He produced and identified the insurance file pertaining to plaintiff's claim for disability benefits. It contained a number of documents, including reports of doctors following examinations of plaintiff. On objection the court excluded the contents of the file, but permitted Mr. Adams to testify to the amounts of money paid plaintiff for his disability and to state on what supportive basis it was determined that these payments were due, i. e., that benefits were "paid based on evidence of total disability." This testimony was not admitted to show the substantive fact of total disability. It was competent on the issue of damages for plaintiff to show the basis of payments made to plaintiff under the disability program as bearing upon the calculation of plaintiff's past and future loss of wages. The contents of the file, inadmissible as hearsay, were properly excluded. The amount of disability payments, however, was pertinent to the inquiry and there was no error in permitting Mr. Adams to testify that these amounts were based on evidence of plaintiff's total disability, without detailing that evidence. *Scott v. Missouri Ins. Co.*, 222 S.W.2d 549, 554[3] (Mo.App.1949). Indeed, it would have been impossible to introduce evidence of the payments without showing the basis, because total disability was the criterion for payment. The reference to total disability was therefore a necessary part of Mr. Adams' testimony. Furthermore, the evidence was cumulative merely. Plaintiff's testimony indicated total and permanent disability. There was medical evidence of that fact. Finally, this evidence benefited defendants, from the standpoint of mitigation of damages. Plaintiff's counsel in final argument conceded that defendants should be credited with these payments.

Accordingly, the order of November 25, 1975 is reversed and the cause is remanded with directions to enter judgment in accordance with the verdict in favor of plaintiff and against both defendants as of October 24, 1975 in the amount of $125,000.

SMITH, J., and ALDEN A. STOCKARD, Special Judge, concur.