**TRI-COUNTY RETREADING, INC., a corporation, Plaintiff/Appellant,**

v.

**BANDAG, INCORPORATED, an Iowa corporation, and Andrew Sisler, Defendants/Respondents.**

No. 62457.

Missouri Court of Appeals, Eastern District, Division Three.

April 20, 1993.

Kim Roger Moore, Perryville, for plaintiff/appellant.

Michael A. Bowen, Milwaukee, WI, Thomas Blumeyer Weaver, St. Louis, for defendants/respondents.

GARY M. GAERTNER, Presiding Judge.

Appellant, Tri–County Retreading, Inc., appeals from an entry of summary judgment on a contract action in favor of respondents, Bandag, Incorporated and Andrew Sisler. We affirm.

The parties entered into a Franchise Agreement on October 3, 1983, whereby appellant received the right to utilize a tire retreading method for truck and bus tires developed and promoted by respondent, Bandag. Pursuant to the agreement, respondents had access to regular reports regarding appellant's financial status. Respondents received two financial statements from appellant in 1989: one dated June 30, 1989; the other dated October 19, 1989. These statements indicated that appellant's liabilities exceeded its assets. Indeed, appellant admits the financial statements established a net operating loss for the year 1988 of over $41,000.00. In addition, it was concluded that during the first six months of 1989, appellant was operating at a loss of over $51,000.00.

Besides being insolvent and operating at a loss, appellant also admitted to being behind in payments to respondent, Bandag, and other vendors. Appellant concedes there were times when its payments to Bandag were as much as 120 days past due.

In July, 1989, Andrew Sisler, a representative for Bandag, spoke with appellant regarding a renewal of the Franchise Agreement as the previous contract was nearing its expiration. On September 6, 1989, Bandag's credit department approved appellant for a franchise renewal. However, on October 9th of the same year, Mr. Sisler informed appellant that because of Bandag's concern regarding appellant's financial condition, the franchise would be terminated. Appellant received formal notification of the franchise termination in a letter dated October 31, 1989, with such termination effective 30 days from the date of the notice. Appellant was offered the opportunity to stave off the termination by curing its default and paying Bandag over $72,000.00 within that 30 days. Appellant was unable to do so.

Shortly before October 25th, appellant placed an order to purchase rubber from Bandag. On the 25th, appellant received a phone call from Bandag's credit department approving the order. However, on October 26th, appellant was contacted by another Bandag representative who informed appellant that the order had been refused. Because of this refusal, appellant was forced to turn away customers as it did not have the necessary rubber for retreading.

In addition to the facts above, appellant submitted affidavits in opposition to respondents' motion for summary judgment from which the following facts were adduced: Randy Politte, a Tri–County employee at the time of the franchise termination, testified in his affidavit that Paul Long from Tires & Treads, a Bandag franchise in competition with appellant, called him on October 9 and 10, 1989, and offered him a job at Tires & Treads. Mr. Long indicated the offer was forthcoming as he had heard from respondent, Andrew Sisler, that appellant was losing its franchise.

Jerry McKalip, also a Tri–County employee at the time of the franchise termination, testified in his affidavit that on October 9, 1989, Paul Long and Jim Carroll of Tires & Treads approached him and asked if he was going to "need" a job.

Michael Parks from Ryder Trucks, a customer of appellant, testified in his affidavit that on or about October 10, 1989, respondent, Andrew Sisler, indicated to him "Tri–

County Retreading may no longer be a franchise of Bandag," and Larry Fortney, president and co-owner of Tri–County, "did not know at that time that his franchise may be terminated." Mr. Parks also testified in his affidavit that around October 16, 1989, respondent, Andrew Sisler, called him and told him "Tri–County may be losing their (sic) franchise and would be unable to do [Ryder's] capping." Based on those conversations with Mr. Sisler, Mr. Parks stopped doing business with appellant and "started using F & J" for his recapping work.

Tom Reinert from Federal Leasing, a customer of appellant, testified in his deposition that in early- to mid-October, 1989, Andrew Sisler visited him and told him that "they're [Tri–County] in big financial problems," and that "any rubber that I had involved with Tri–County Retreading could be in a locked door situation, anything that I had there I need to get out of there before, you know, they shut down." Mr. Reinert testified that he interpreted the statements made by Mr. Sisler to mean that Tri–County was going bankrupt. When he asked Mr. Sisler about it, Mr. Sisler said, "I just advise you to get your tires." Mr. Reinert also testified in his deposition that appellant's competitors approached him indicating that appellant was having financial problems.

Appellant filed suit in the Circuit Court of Jefferson County on January 16, 1990, alleging breach of contract, breach of duty of good faith, defamation, and tortious interference. Respondents filed a motion for summary judgment on January 30, 1992. Said motion was called and heard on May 28, 1992. On June 15, 1992, the court issued its Findings of Facts and Conclusions of Law sustaining the motion. This appeal ensued.

■ In reviewing an entry of summary judgment, we view the record in the light most favorable to the party against whom summary judgment was entered. *Meyer v. Enoch*, 807 S.W.2d 156, 158 (Mo. App., E.D.1991). We must determine whether any genuine issue of material fact exists which could require a trial. *Id.* We

will affirm the judgment if it is sustainable as a matter of law under any theory. *Id.*

■ Appellant first contends the trial court erred in finding that Bandag was not required to give 60 days' notice of the termination of the Franchise Agreement. Appellant refers us to Section XI(c)(1) of the Franchise Agreement which requires a 60 day notice by Bandag in the event of a contract termination. However, Bandag argues that the Franchise Agreement was terminated pursuant to Section XI(c)(5) of the Agreement which required only a 30–day notice of termination.

The two relevant provisions of the contract state as follows:

(c) BANDAG shall have the option and right to terminate this Agreement, effective upon giving notice to FRANCHISEE:

1. In the event FRANCHISEE defaults in the performance of any agreement or undertaking in this Agreement and such default is not remedied to BANDAG'S satisfaction within sixty (60) days after written demand for correction, provided that in the case of continuing, repetitive, or subsequent default by FRANCHISEE of the same provision (s) for which prior written demand for correction has been given, BANDAG shall have the right to give notice of termination without demand for correction.

\*    \*    \*    \*    \*    \*

5. In the event FRANCHISEE, upon thirty (30) days written notice, shall fail to duly pay all amounts due for materials, equipment, apparatus, and supplies sold to FRANCHISEE by BANDAG.

Bandag opted to terminate the Agreement pursuant to Section XI(c)(5) requiring only a 30–day notification. Bandag sent correspondence to appellant and, according to the Agreement, gave appellant the opportunity to avoid cancellation of the contract by providing payment in full of all outstanding balances. However, as appellant was unable to do so, Bandag terminated the contract.

■ We find all of Bandag's actions acceptable under the terms of the Franchise

Agreement. We read subsection (c)(1) to address termination of the Agreement based on a general default not covered by a specific provision under subsection (c). Whereas, subsection (c)(5) specifically addresses defaults due to failure to pay amounts due and owing to Bandag and requires only a 30–day notice of termination. It is a well-accepted rule in Missouri that where one contract clause is general and inclusive, and another is more limited and specific, the more specific clause acts to modify and pro tanto nullify the more general clause. *In re Marriage of Buchmiller*, 566 S.W.2d 256, 259 (Mo. App., St.L.D.1978); *Surface v. Ranger Insurance Company*, 526 S.W.2d 44, 48 (Mo. App., Spfld.D.1975). Point denied.

■ Appellant's next point alleges error in the granting of summary judgment on the breach of duty of good faith and fair dealing claim raised by appellant. Appellant asserts that because of the parties' relationship under the Franchise Agreement, these duties were owed by Bandag to appellant. As such, argues appellant, there was a genuine issue of fact as to Bandag's lack of honesty in fact in failing to deliver the rubber ordered by appellant and in soliciting appellant's customers away from appellant.

■ We first note that Section XX of the Franchise Agreement established that the Agreement was to be "governed by and interpreted under the laws of the State of Iowa." Missouri recognizes that contracting parties may choose the state whose law will govern the interpretation of their contractual rights and duties. *Nakao v. Nakao*, 602 S.W.2d 223, 226 (Mo.App., S.D. 1980). So long as application of the chosen law is not contrary to a fundamental policy of Missouri, we will honor the parties' choice of law provision. *State ex rel. Geil v. Corcoran*, 623 S.W.2d 555, 556 (Mo.App., E.D.1981); *Comerio v. Beatrice Foods Co.*, 595 F.Supp. 918, 921 (E.D.Mo.1984).

Our research into Iowa law for cases sustaining claims regarding a breach of the implied covenant of good faith and fair dealing in franchise agreements has left us empty-handed. There is Iowa caselaw

holding that an employer must have acted in good faith in the discharge of an at-will employee; and actions in this regard must be brought in tort as opposed to contract. *See, Springer v. Weeks & Leo Co., Inc.*, 429 N.W.2d 558, 560 (Iowa 1988). Additionally, Iowa courts recognize actions against insurance companies for bad faith conduct in settling claims or denying benefits. *See, Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988). However, we have been unable to uncover any Iowa cases discussing a requirement of good faith and fair dealing in regard to franchise agreements.

In a different vein, Bandag points us to an Iowa case which provides that where a contract is fully integrated, an implied covenant cannot be found. *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 28 (Iowa 1978). We find the Agreement before us to be fully integrated. Section XXI of the Franchise Agreement states in relevant part:

### XXI. ENTIRE AGREEMENT

This is the entire Agreement and, when executed in duplicate by the parties hereto, supersedes all prior agreements and communications, either verbal or in writing between the parties hereto with respect to the subject matter hereof, ... FRANCHISEE certifies that FRANCHISEE'S decision to enter into this Agreement is based solely on the terms and conditions of this Agreement and is not influenced or based on any separate written or verbal communications or understanding or representation by or with BANDAG ...

Therefore, though Iowa has not addressed the potential for claims of breach of an implied covenant of good faith and fair dealing in relation to franchise agreements, the fact that Iowa has held that implied covenants cannot be found in fully integrated agreements is fatal to appellant's claim. Point denied.

■ For its third point, appellant asserts the trial court erred in granting summary judgment on appellant's claim of defama-

tion. Appellant contends summary judgment was improper because various representatives of Bandag made defamatory statements to competitors and customers of appellant regarding appellant's financial situation. According to appellant, a genuine issue of fact still remains as to the falsity of those statements.

■ We note that appellant failed to set out in its petition the express statements which are claimed to be defamatory. It is necessary to state the specific words which are argued to be defamatory in order to state a cause of action. *Shurn v. Monteleone*, 769 S.W.2d 188, 191 (Mo.App., E.D. 1989). Because appellant has failed to do so, no cause of action has been alleged, and summary judgment was properly entered. Point denied.

Appellant's final point alleges error in the granting of summary judgment on the tortious interference with business claim. Appellant suggests there is a genuine issue of fact as to whether Bandag representatives used improper means in disclosing confidential information and in refusing to deliver rubber to appellant.

■ There are five elements which a plaintiff must prove to establish the tort of intentional interference with a contract or business expectancy: 1) a contract, valid business relationship, or expectancy; 2) the defendant's knowledge of the contract, business relationship, or expectancy; 3) the defendant's intentional interference inducing or causing a breach of the contract or relationship; 4) the lack of justification for defendant's actions; and 5) the damages resulting from the defendant's conduct. *Honigmann v. Hunter Group, Inc.*, 733 S.W.2d 799, 807 (Mo.App., E.D.1987).

There is no argument that appellant had valid business relationships with its customers and expected that those relationships would continue. There is also no dispute that Bandag was aware of appellant's business relationships with its customers. Regarding the third element, appellant asserts Bandag intentionally and improperly interfered with appellant's business relations with its customers, thereby causing the customers to breach their relationships with appellant. In response, Bandag justifies its acts as attempts to protect its own economic interests.

■ "One may act in a manner that interferes with another's business expectancy if by so doing one is acting to protect one's own economic interests." *O'Connor v. Shelman*, 769 S.W.2d 458, 461 (Mo.App., W.D.1989) (citations omitted). Although this is so, one may not utilize improper means—means which are independently wrongful regardless of injury—to protect one's interests. *Community Title Co. v. Roosevelt Federal S & L Ass'n*, 796 S.W.2d 369, 373 (Mo. banc 1990). Appellant, as the plaintiff below, carries the burden of producing "substantial evidence" to show the absence of Bandag's justification for the interference. *Id.* at 372.

Appellant contends Bandag used improper means in this case as evidenced by statements by Bandag's representatives to Tri-County customers, namely, Michael Parks of Ryder Trucks and Tom Reinert of Federal Leasing, that appellant was insolvent and was losing its franchise. Appellant also claims Bandag's failure to honor appellant's order for rubber in October of 1989 was improper.

■ It is true that use of defamatory statements is considered an improper means of protecting one's own economic interests. *Id.* at 373. Appellant asserts comments made to Michael Parks of Ryder Trucks constitute defamation. We disagree.

It must first be pointed out that Ryder Trucks was a "BOND" customer. BOND is an acronym for "Buyer Oriented Network of Dealers." As such, Ryder Trucks was officially a customer of Bandag. Bandag, in an effort to service BOND customers, would subcontract the BOND customers' work to local franchises. Appellant was the subcontractor responsible for servicing Ryder Trucks. Because Ryder was actually a customer of Bandag, Bandag had a legitimate economic interest in maintaining its account with Ryder.

■ Additionally, according to the affidavit of Michael Parks, the only statements made to him by Bandag representatives as of October 10, 1989, were that "Tri–County Retreading may no longer be a franchisee of Bandag ... [and] that Larry Fortney [president of Tri–County] did not know at that time that his franchise may be terminated ..." Bandag did, in fact, terminate its Franchise Agreement with appellant on December 1, 1989. Therefore, the statements made by Bandag representatives to Michael Parks were true. Truth is an absolute defense to a claim of defamation. *Henry v. Halliburton*, 690 S.W.2d 775, 780 (Mo. banc 1985). Thus, though Ryder did take its business from appellant and send it to another Bandag franchisee, we find that Bandag acted properly in protecting its economic interest and suggesting to Ryder that it send its business elsewhere.

■ Appellant also argues that statements made to Tom Reinert of Federal Leasing were defamatory and constituted an improper means of protecting Bandag's economic interest. Federal Leasing was not a BOND customer. It was a customer of appellant's. In his deposition, Mr. Reinert indicated that Andy Sisler and Steve Doing of Bandag informed him that appellant was "in big financial trouble." Additionally, Reinert stated the two suggested "that any rubber that I had involved with Tri–County Retreading would be in a locked door situation, anything that I had there I need to get out of there before, you know, they shut down ... I basically interpreted that to mean that they were going bankrupt and any tires that I had down here would be locked up in court."

"False statements tending to prejudice or injure a person in his business by [suggesting] ... that he is unreliable, insolvent, and unable to comply with the contract [citations omitted] are actionable." *Coonis v. Rogers*, 429 S.W.2d 709, 714–15 (Mo.1968). However, appellant suffered no damages due to the improper actions of Bandag, here. Tom Reinert continued to do business with appellant until appellant itself informed Reinert of its inability to continue servicing Federal Leasing. Appellant has failed to support its claim of tortious interference regarding Tom Reinert and Federal Leasing. The third and fifth elements necessary to establish such a claim are missing, as Federal Leasing continued to do business with appellant with no resulting loss to appellant.

■ Finally, appellant argues Bandag tortiously interfered with appellant's business relations by refusing to send the rubber which appellant ordered during the last half of October, 1989. However, nowhere in the Franchise Agreement does it state that Bandag was to be the sole supplier of rubber for appellant. To the contrary, the contract indicates that appellant could select its own supplier so long as the materials, equipment, and supplies purchased by appellant met Bandag's standards of quality. Because appellant could have gone elsewhere to obtain the rubber it needed, we do not find Bandag's refusal to provide the October order of rubber to constitute interference with appellant's business.

Based on the foregoing, we sustain the entry of summary judgment and affirm the actions of the court below.

SMITH and STEPHAN, JJ., concur.