John E. DWYER, as Statutory
Trustee of Good Needles, et al.,
Plaintiff/Respondent,

v.

ING INVESTMENT COMPANY, INC.,
et al., Defendants/Appellants.

No. 63816.

Missouri Court of Appeals, Eastern District,
Division Two.

Nov. 8, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 14, 1994.

Application to Transfer Denied
Jan. 24, 1995.

Robert H. Wendt, St. Louis, for appellants.

Jay L. Levitch, Henry F. Luepke, the
Stolar Partnership, St. Louis, for respondent.

SMITH, Presiding Judge.

Defendants appeal from a judgment based on six verdicts by a jury in a case seeking to pierce the corporate veil of ING Investment Company. We affirm.

For approximately fifty years John E. Dwyer served as the outside accountant for Victory Manufacturing Company, a clothing manufacturer. During the early 1980's Dwyer assisted plaintiff Gene Schneider, the owner of Victory, to obtain a letter of credit for the company from Colonial Bank. Both Dwyer and Schneider personally guaranteed the letter of credit and the bank took a security interest in all of Victory's manufacturing equipment. Victory defaulted on the loan. Faced with the choice of allowing the equipment to be sold by the bank and having to make up a deficiency or acquiring the equipment from the bank and attempting to continue the operation of a clothing manufacturing business Dwyer opted for the latter. He formed Good Needles, Inc. in 1985, and in exchange for Victory's equipment and property gave the bank a promissory note for $235,000. Dwyer personally guaranteed the note. Schneider ran the day-to-day operations of Good Needles.

Shortly after the formation of Good Needles, Dwyer determined to retire from the garment manufacturing business. For that purpose his attorney incorporated ING Investment Company. Defendant Gordon Thudium, previously president of Colonial Bank, purchased ING from Dwyer and took over Good Needles' operations. Thudium paid Dwyer $500 for the ING stock and became the president and sole shareholder of ING. As part of the transaction Thudium, as president of ING, entered into a lease agreement for ING to lease Good Needles equipment and property and make installment lease payments totaling $275,000 over a six year period. Good Needles in turn assigned the equipment lease to the bank for the purpose of paying off the Good Needles loan with ING's lease payments which in turn would release Dwyer from his personal guarantee. Thudium personally made an initial $3000 payment on the lease agreement and no subsequent payments. As a result the bank returned the lease and assignment to Dwyer stating it was up to him to collect the payments from ING. Thereafter the bank demanded payment from Dwyer on his Good Needles guarantee which demand he honored.

Thudium testified that he intended to operate as a shell corporation. Shortly after acquiring ING, Thudium helped form the Starline Apparel partnership. Thudium and the Grand Fisher partnership were each 50% partners in the Starline partnership. The Grand Fisher partnership was composed of defendants Thomas D. Maurer, Bill Estabrook, Nevan Fisher, John Fisher, H.D. Fisher and James Fisher. Thudium served as operating officer of Starline.

In August 1987, Dwyer made demand on ING for payment under the equipment lease. No response was forthcoming. In October, 1987, ING and Starline entered into an agreement whereby ING's employees performed the labor required to manufacture Starline's garments, using the Good Needles equipment leased to ING, for which Starline paid ING only its payroll expenses and payroll taxes. Until at least 1991 Starline was ING's only customer. ING therefore received only its bare labor costs with no overhead or profit included and no remuneration for the use of the equipment leased from Good Needles. Thudium also allowed two Starline customers to occupy a portion of ING's factory for periods of six months to one year rent free.

In November 1986, ING entered into a separate agreement with Dwyer and Schneider referred to by the parties as the Colonial Bank agreement because it was arrived at during a meeting at that bank. ING, with Schneider's supervision, was to manufacture garments that Schneider estimated could be sold for approximately $220,000. Dwyer provided Thudium with $70,000 borrowed from Colonial Bank to cover the labor costs of producing the garments. The debt was collateralized by Dwyer's home in Florida. The proceeds of sale of the garments were to be applied first to repayment of the Dwyer loan, then $26,000 to Schneider, and the remainder to be split 60% to Dwyer and 40% to ING. ING commenced manufacturing the garments. Approximately in Feb-

ruary 1987, ING at Thudium's direction ceased producing garments pursuant to the Colonial Bank agreement. ING periodically stopped making the garments in order to provide Starline the labor it needed to make garments covered by Starline contracts. Thudium finally refused to continue under the Colonial Bank agreement and also refused to allow the sale of the garments which had already been made. Dwyer was never repaid the $70,000 and eventually sold his Florida home to pay the loan.

Dwyer brought suit as statutory trustee for Good Needles seeking recovery of the amount due under the equipment lease agreement ($272,000 plus interest) against all defendants. In his individual capacity he also sued ING and Thudium for breach of the Colonial Bank agreement. Schneider sued all the defendants for breach of the Colonial Bank agreement and for breach of an employment agreement. He also sued ING and Thudium in replevin for certain items of personal property located on the ING business premises which ING refused to return.

The jury returned verdicts (1) in favor of Dwyer as statutory trustee for Good Needles and against all defendants for breach of the equipment lease, awarding damages of $272,000 plus interest and return of the equipment (2) in favor of Dwyer in his individual capacity and against ING and Thudium for breach of the Colonial Bank agreement, awarding damages of $25,000 plus interest, (3) against Schneider on his claim of breach of the Colonial Bank agreement, (4) in favor of Schneider and against all defendants for breach of an employment agreement, awarding damages of $4665, (5) in favor of Schneider and against ING and Thudium on the replevin action assessing damages at $1000 and ordering return of specified property. The trial court entered judgment in accordance with the verdicts. This appeal follows.[1]

■ The contracts upon which plaintiffs premise their recoveries for breach were with ING, a corporation. To reach beyond ING to an individual stockholder and the Starline partnership, plaintiffs must successfully pierce the corporate veil. Defendants contend the evidence is not sufficient as a matter of law to warrant such piercing. One of the fundamental policies underlying corporation law is the encouragement of business ventures by providing for limited liability. The rationale behind piercing the corporate veil is that when a controlling entity or individual misuses the controlled corporation for the controlling entity's own purposes, rather than the purposes of the controlled corporation, it loses the limited liability privilege and the debts of the controlled corporation become the obligations of the controlling entity or individual. *F.C. Imports, Inc. v. First National Bank of Boston*, 816 F.Supp. 78 (D.C.Puerto Rico 1993) [22–27].

■ There are at least two tests which have been articulated to determine whether the corporate veil should be pierced. The instrumentality test is that set out in *Collet v. American National Stores, Inc.*, 708 S.W.2d 273 (Mo.App.1986) [l.c. 284]:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

The alter ego test was articulated in *Swall v. Custom Automotive Services, Inc.*, 831 S.W.2d 237 (Mo.App.1992) [1] as requiring the court to find first that "the corporation must be controlled and influenced by persons or by another corporation; second, the evidence must establish that the corporate cloak was used as a subterfuge to defeat public

---

1. Defendants do not specifically address verdicts 2 and 4 and their argument does not challenge those verdicts.

convenience, to justify a wrong, or to perpetrate a fraud." The doctrines behind the tests are basically the same and we regard the tests as interchangeable. Most courts do. Phillip I. Blumberg, *The Law of Corporate Groups: Substantive Law* § 6.01 (1987).

No real dispute exists here that ING corporation was totally controlled by Thudium and that all corporate decisions were made by him. The usual corporate record keeping and formalities did not occur and no one but Thudium determined the actions of the corporation. It is further clear that control was utilized for purposes other than the benefit of ING. The arrangement whereby ING was compensated by Starline for only its labor costs but not for overhead nor profit nor for use of its equipment could not possibly benefit ING which could make a profit only if it received reimbursement for more than its labor costs. Obviously, if a business recovers only a portion of its expenses it is impossible to make a profit and it is guaranteed a loss. ING had no other customers except Starline. The arrangement was beneficial only to Starline. Termination of the Colonial Bank agreement was similarly beneficial only to Starline and detrimental to ING. ING lost its share of the profits from the sale of the garments produced and to be produced under the agreement in order that it could supply garments to Starline at a loss. No corporation acting in its own best interests would enter into such suicidal arrangements. The only reasonable inference is that it was being used solely to benefit the controlling entity or individual and had no will, life or existence of its own.

There was also evidence that Thudium used ING not only to benefit Starline but also to personally benefit himself. ING funds were utilized to pay an accountant for Thudium's personal tax work. Thudium also utilized losses from ING, a sub-chapter S corporation, to offset capital gains realized from the sale of his Colonial bank stock. He therefore benefitted from ING's losses. He also received salary totalling $47,700 from ING during the five years from 1986 through 1991.

The second element of both tests—wrongful, dishonest and unjust act—is also met here. There are a number of indicators utilized by courts to justify piercing the corporate veil because such indicators justify the inference that they occurred for an improper purpose. Operating a corporation without sufficient funds to meet its obligations is circumstantial evidence tending to show either an improper purpose or reckless disregard for the rights of others. *Swall v. Custom Automotive Services, Inc., supra* at [7]. Thudium testified that he intended to operate ING as a "shell" corporation. The arrangements he made with Starline and termination of the Colonial Bank agreement evidence his intention to preclude ING from ever having sufficient assets to meet its obligations, including payment of the equipment lease installments which it had a contractual duty to do. He knew of the equipment lease and that failure to require sufficient payments from Starline to ING for use of that equipment would cause a breach of ING's contract with Good Needles and directly damage Dwyer.

Operation of a corporation without a profit objective is another indicator. *Henderson v. Rounds & Porter Lumber Co.*, 99 F.Supp. 376 (D.C.Ark.1951) [7]. We have already discussed the evidence establishing this indicator and need not repeat it.

Manipulation of assets is another indicator. *Camelot Carpets, Ltd. v. Metro Distributing Company*, 607 S.W.2d 746 (Mo.App.1980). Because of the arrangement with Starline assets which could have been utilized to pay ING's creditors, notably Good Needles, never reached ING to be used for that purpose. Those assets were presumably used to pay the debts of Starline. Defendants contend that this is simply a preference of creditors. A similar contention was raised in both *Swall* and *Camelot* and rejected. We reject it here. *See also, Ted Harrison Oil Company, Inc. v. Dokka*, 247 Ill.App.3d 791, 187 Ill.Dec. 441, 617 N.E.2d 898 (Ill.App.1993) [11].

The third element set forth in *Collet*, causation, has also been satisfied here. The evidence warrants the inference that if ING had been paid a commercially reasonable rate for the work it did for Starline, payments under the equipment lease could have been made for the benefit of Good Needles

and eventually Dwyer. The inference can also be drawn that had the Colonial Bank agreement not been terminated and had the merchandise which had been produced been sold Dwyer would have received money which Thudium's manipulation of ING precluded. The thrust of defendants' argument for not allowing recovery here is that Starline also lost money and that Good Needles would not have been paid under any circumstance. The evidence does not demand such a conclusion. ING and Starline continued in existence for the entire payoff period of the equipment lease. It is rank conjecture to assume that if ING had received commercially reasonable payment for the garments it produced that ING and Starline would have ceased to exist some time during the life of the equipment lease. To the degree that assertion is a contention that recoverable damages would have been less the burden was on the defendants to establish that fact. The verdict authorizing the piercing of the corporate veil was supported by the evidence.

We turn now to the liability of the Starline partners. Section 358.130 RSMo 1986 provides:

Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Section 358.150 provides:

All partners are liable jointly and severally for everything chargeable to the partnership under sections 358.130 and 358.140, and for all other debts and obligations of the partnership. Any partner may enter into a separate obligation to perform a partnership contract.

There are four elements for liability under § 358.130. That (1) a partner (2) committed a wrongful act (3) while acting in the ordinary course of the business of the partnership (4) causing someone not a partner loss or injury. Thudium was clearly a partner in Starline. While we have already held that Thudium committed a wrongful act in his manipulation of ING the focus here is on his committing a wrongful act as a partner of Starline. A partner commits a wrongful act under the statute when he commits a tortious act or an act of fraudulent misconduct. Martin v. Yeoham, 419 S.W.2d 937 (Mo.App.1967) [13–16]; Martin v. Barbour, 558 S.W.2d 200 (Mo.App.1977) [7–11]. A tortious interference with a valid business relationship requires the existence of a contract or valid business relationship, defendant's knowledge of the contract or relationship, intentional interference in causing breach of the contract or relationship, absence of justification and damages resulting from the conduct. Tri–County Retreading, Inc. v. Bandag, Inc., 851 S.W.2d 780 (Mo.App.1993) [11]. From our prior discussion it is apparent that each of these elements was met in this case. Good Needles and ING had a business relationship, as did Schneider and ING. Thudium, in his capacity of operating officer of Starline intentionally interfered with those known relationships without justification causing damage to Good Needles and Schneider. The wrong was committed in behalf of and within the reasonable scope of the business of the partnership. Martin v. Yeoham, supra at [13–16]. The evidence was adequate to support the verdict and to make a submissible case to justify piercing the corporate veil.

Defendants have perfunctorily raised three other issues. We find no merit to them and further discussion would have no value.

Judgment affirmed.

PUDLOWSKI and WHITE, JJ., concur.