978 F.Supp. 1281 (1997)
FLEMING COMPANIES, INC.[1], Plaintiff,
v.
Max RICH, et al., Defendants.
No. 4:94CV838SNL.
United States District Court, E.D. Missouri, Eastern Division.
September 30, 1997.
*1282 *1283 *1284 Jay A. Summerville, Armstrong and Teasdale, St. Louis, MO, for Malone & Hyde, Inc.
Michael J. McKitrick, Danna and McNary, St. Louis, MO, for Max Rich, Rose Rich.
Michael A. Gross, St. Louis, MO, for Sanford Rich.
John S. Metzger, Associate, Jay A. Summerville, Armstrong & Teasdale, St. Louis, MO, for Fleming Companies, Inc.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
Plaintiff, a grocery wholesaler, has brought this action seeking to recover monies owed to it for goods bought and delivered. Specifically, plaintiff alleges that defendant Sanford Rich engaged in a fraudulent scheme to divert corporate monies from being utilized to pay creditors (of which plaintiff is one) for his personal use. The alleged scheme involved, but was not limited to, the transfer of corporate funds to defendants Max and Rose Rich as "rent" and as substitute collateral for their pledge of a certificate of deposit as collateral for Sanford Rich's personal debt. Plaintiff seeks to have the Court declare void and null the transfer of corporate monies to Max and Rose Rich as fraudulent conveyances under the Missouri Uniform Fraudulent Transfer Act; and hold defendant Sanford Rich personally liable for the default judgments entered in favor of plaintiff and against defendant Sanford Rich's grocery stores. The case was tried before the Court sitting without a jury from February 6-8, 1996. At the conclusion of trial, all parties made oral motions for judgment as a matter of law. These motions were taken with the case.
Before commencing with the Court's factual and legal findings, certain preliminary matters must first be addressed. Taken with the case are the defendants' motion in limine concerning the testimony of David Steimel; and the plaintiff's objections to the testimony of defendant's witness Jack Hunstein, and the defendants' post-trial submission of the affidavit of witness Jonathan Becker. As to the defendants' motion in limine regarding David Steimel, the Court will grant the motion only in so far as to the statement of this witness to plaintiff's counsel in August 1995. However, the motion is denied as to the live testimony of this witness, and such witness' testimony will be considered in the resolution of this case. Having considered the plaintiff's objections to the testimony of Jack Hunstein and the post-trial submission of Becker's affidavit, the Court will sustain the objections. Mr. Hunstein was never identified during discovery as an expert witness (on the subject of the appraisal of the Overland Dairy Market store in St. John, Missouri). Consequently, his testimony will be disregarded by the Court. Mr. Becker's affidavit is nothing more than a post-trial "offer of proof" regarding testimony that this Court had already sustained an objection to at trial. Consequently, the affidavit will not be considered in the resolution of this case.
After careful consideration of all other objections to exhibits taken with the case, all said objections are hereby overruled, and all exhibits offered into evidence at trial are received into evidence. Any remaining objections to the introduction into evidence of any party's discovery responses are hereby overruled. This Court, having now considered the pleadings, the testimony of witnesses, documents in evidence, and the joint stipulation of facts filed by the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
Overland Dairy Market, Union Thrift Market, Overland Dairy Thrift Market d/b/a/ Pennywise, and Overland Thrift Market are Missouri corporations. The corporations operated as a chain of grocery stores during the relevant time period. They are collectively referred to as the "Overland Dairy Stores".[2]
*1285 Defendants Max and Rose Rich are the elderly parents of defendant Sanford Rich. They began the family grocery business in 1954 by opening a store in Overland, Missouri which became to be known as the Overland Dairy Thrift Market d/b/a/ Pennywise.[3] In the 1970s, their two sons defendant Sanford Rich and Ron Rich joined them in the grocery business and independently opened several more stores, including but not limited to the afore-mentioned stores. In 1981 Max and Rose turned over the entire grocery business to Sanford and Rich to operate. Max and Rose retained ownership of the physical premises of Pennywise, and in 1985 entered into a lease arrangement with Pennywise. Defendants' Exhibit W. This lease was signed by Ron Rich on behalf of Pennywise; however, there are no signatures on the lease by either Max or Rose Rich. The lease term was for five (5) years beginning on June 1, 1985 and ending on June 31, 1990. There was no evidence at trial that this lease was ever renewed upon its expiration. The monthly rental payments were $2500.00. However, no rent was ever paid to Max or Rose Rich from 1985 through 1992, although it appears that the rent obligations was noted monthly on the financial books for the Overland Dairy Stores.
In 1983, Sanford acquired a restaurant known as Koppermans which was incorporated as Daddy Rich, Inc. During the relevant time-period, Sanford Rich was the 100% owner and sole shareholder, director, and officer of Daddy Rich, Inc. During the relevant time-period, Koppermans operated independently of the Overland Dairy Stores.
In 1987, Sanford Rich became, and remained during the relevant time-period, the 100% owner and sole shareholder, director and officer of the Overland Dairy Stores. As chief executive officer, he was ultimately responsible for the operations of the various subject stores. His office was at the companies' headquarters at 8707 St. Charles Rock Rd; the same location of the Overland Dairy Market store. During the relevant time-period, he was compensated weekly for his services.
On August 15, 1988, a line of credit promissory note was purportedly executed by Overland Dairy Market in favor of Sanford Rich in the amount of $75,000. Plaintiff's Exhibit 47[4]. The line of credit was allegedly secured by a second Deed of Trust on a farm owned by Overland Dairy Market in Audrain County, near Mexico, Missouri [hereinafter referred to as the "Mexico farm"]. Although the note was executed by defendant Sanford Rich on August 15, 1988, it was not recorded until March 26, 1991 due to a financing arrangement between Overland Dairy Market and the First National Bank of Mexico, Missouri which resulted in the Bank acquiring a first lien on the farm (i.e. the Bank held a first Deed of Trust on the farm). The line of credit funds were advanced in $5000.00 allotments (in August and September 1988) directly from Koppermans' bank account and deposited into the Overland Dairy Stores' accounts as follows:

8/17/88 $5000 Overland Dairy Market
8/17/88 $5000 Overland Dairy Market
8/17/88 $5000 Union Thrift Market
8/17/88 $5000 Union Thrift Market
9/27/88 $5000 Overland Dairy Bridgeton
9/27/88 $5000 Union Thrift Market
9/27/88 $5000 Union Thrift Market
9/27/88 $5000 Overland South County
9/27/88 $5000 Overland South County
9/27/88 $5000 Overland South County

Plaintiff's Exhibit 49. The monies deposited in the accounts of stores other than Overland Dairy Market were secured by a series of demand promissory notes in favor of Overland Dairy Market. Defendants' Exhibits D-1, D-2, D-3, E, and F. On September 1, 1992, pursuant to the August 15, 1988 Line of credit promissory note, Koppermans advanced *1286 $20,000.00 to Overland Dairy Market which was deposited into Overland Dairy Market's bank account.
Also, on August 15, 1988 and September 27, 1988, three demand promissory notes were executed by Sanford Rich in favor of Koppermans, in the amounts of $10,000.00; $30,000.00; and $10,000.00, respectively. Defendants' Exhibits C-1, C-2, and C-3. All of the promissory notes, including the line of credit note, executed by the various Overland Dairy Stores or defendant Sanford Rich are signed only by Sanford Rich. None of these notes are notarized as to signature or date of the note.
Associated Grocers, Inc. (Associated) served as the grocery wholesaler for Overland Dairy Market Union Thrift Market, Pennywise, and Overland Dairy Thrift Market until October 1991, when Malone & Hyde became their grocery wholesaler. Associated had a first UCC lien position in the inventory of these stores. Malone & Hyde has a second UCC lien position. At the time Associated stopped supplying groceries, Overland Dairy Market, Union Thrift Market, Pennywise, and Overland Thrift Market collectively owed money to Associated.

I. The Debt of the Overland Dairy Stores to Malone & Hyde
Malone & Hyde extended credit terms to Overland Dairy Market, Union Thrift Market, Pennywise, and Overland Dairy Thrift Market. Payment for the groceries delivered between Monday and Friday of a week was due on the Friday (or the last business day) of the following week. The grocery orders were normally transmitted by each store manager through a computerized hookup with the plaintiff. Plaintiff was also kept abreast of inventory levels at each store through a computer hook-up via the checkout scanners. The decision as to type of grocery items and amount of grocery items to order was generally left to the sole discretion of each store manager. However, "ad items" (groceries that would appear in newspaper advertisements or circulars during a given week) were ordered by Richard Jokerst, Vice-President of Operations for the Overland Dairy Stores. Defendant Sanford Rich, Jokerst, and Richard Eve, comptroller for the Overland Dairy Stores, regularly reviewed invoices for these orders prior to payment. Payment was tendered only upon final approval by Sanford Rich.
Malone & Hyde served the Overland Dairy Stores from its warehouse in Sikeston, Missouri. Don Weber, sales consultant for Malone & Hyde, regularly visited the Overland Dairy Stores to check inventory levels and general operation of the stores. His primary contact was with Jokerst.
Grocers typically increase their inventory several weeks prior to the Christmas holidays; and typically reduce their inventory orders during the week between Christmas and New Years. However, historically, the Overland Dairy Stores sales had been strong during the Christmas and New Years holiday season primarily because they were the only full line grocery stores in their trade areas that were open on these holidays. In the past, the Overland Dairy Stores increased their wholesale grocery purchases in December in comparison to their usual wholesale grocery purchases for the rest of the year.
The Overland Dairy Stores had been experiencing financial difficulties for some time prior to the events giving rise to this litigation. In the fall of 1992, these financial difficulties began to quickly escalate. In September 1992, Sanford closed the Overland Thrift Market store. At the time Overland Thrift Market closed, it was current with Malone & Hyde, and is not now indebted to Malone & Hyde.[5] As of December 21, 1992, Sanford Rich decided to close Pennywise after the first of the year.
Up until December 1992, the Overland Dairy Stores operated under self-imposed ordering restrictions because of cash flow problems. Shelves were to be kept stocked, and little inventory kept in the backroom. Generally, orders were limited to that amount which could be sold within a week or so. However, in mid-December the ordering restrictions *1287 were lifted. The grocery orders for the last two weeks in December 1992 were significantly increased upon orders from Sanford Rich. The grocery orders were not typical of the orders for the last several months; multiple cases of grocery items with long shelf lives were ordered.
The groceries ordered and delivered to the Overland Dairy Stores for the week of November 16 through November 19, 1992 were as follows[6]:

Overland Dairy Market $23,573.53
Union Thrift Market $20,823.78
Pennywise $ 5,190.28

The groceries ordered and delivered to the Overland Dairy Stores for the week of November 23 through November 27, 1992 were as follows:

Overland Dairy Market $23,163.86
Union Thrift Market $13,961.24
Pennywise $ 5,268.10

The groceries ordered and delivered to the Overland Dairy Stores for the week of November 31 through December 4, 1992 were as follows:

Overland Dairy Market $33,663.10
Union Thrift Market $25,213.39
Pennywise $ 3,778.42

The groceries ordered and delivered to the Overland Dairy Stores for the week of December 7 through December 11, 1992 were as follows:

Overland Dairy Market $30,542.97
Union Thrift Market $19,356.68
Pennywise $ 1,999.12

The groceries ordered and delivered to the Overland Dairy Stores for the week of December 14 through December 18, 1992 were as follows:

Overland Dairy Market $22,323.25
Union Thrift Market $13,895.53
Pennywise $ 5,287.43

The groceries ordered and delivered to the Overland Dairy Stores for the week of December 21 through December 24, 1992 were as follows:

Overland Dairy Market $59,218.52
Union Thrift Market $46,624.65
Pennywise $22,028.41

The groceries ordered and delivered to the Overland Dairy Stores for the week of December 28 through December 31, 1992 were as follows:

Overland Dairy Market $68,366.27
Union Thrift Market $61,866.64
Pennywise $28,456.76

Payment for the groceries ordered and delivered to the Overland Dairy Stores during the week of December 21-24, 1992 was due on December 31, 1992. On December 31, 1992 Lois Boschert, the accounting clerk for the Overland Dairy Stores, generated three (3) checks from each of the stores' bank accounts to pay plaintiff for the groceries delivered during the week of December 21-24. The checks could not be released until Sanford Rich approved their release. Sanford refused to approve the release of the checks.
When Edwin Brawner, Controller for plaintiff's Sikeston Division, was informed that the Overland Dairy Stores had not paid their outstanding invoices for the groceries delivered during the week of December 21-24, 1992 he called and spoke with Sanford Rich. Sanford Rich informed Brawner that the Overland Dairy Stores were unable to pay plaintiff for the groceries ordered and delivered for during the weeks of December 21-24 and 28-31, 1992. Further deliveries directly from plaintiff's Sikeston warehouse to the Overland Dairy Stores were immediately suspended. However, some third-party vendors under contract to deliver to the Overland Dairy Stores and directly bill plaintiff for such deliveries, made deliveries in early January 1993 prior to receiving notice to suspend such deliveries.
Overland Dairy Market, Union Thrift Market, and Pennywise have not paid Malone & Hyde for the groceries ordered and delivered during the weeks of December 21-24 and 28-31, 1992, or for the groceries delivered by third-party vendors in early January 1993.
On February 3, 1993 Malone & Hyde filed suit against Overland Dairy Thrift Market (Pennywise) in the United States District *1288 Court for the Eastern District of Missouri seeking a judgment against Overland Dairy Thrift Market (Pennywise) for its failure to pay Malone & Hyde for the groceries it had delivered in a case styled Malone & Hyde, Inc. v. Overland Dairy Thrift Market, Inc., Cause No. 4:93CV00257CEJ. On April 5, 1993, Robert D. St. Vrain, Clerk of the Court, entered a default against Overland Dairy Thrift Market (Pennywise) in Cause No. 4:93CV00257CEJ. On June 28, 1993, Judge Carol E. Jackson entered a judgment against Overland Dairy Thrift Market in the sum of $52,231.42 in Cause No. 4:93CV00257CEJ.
On February 3, 1993, Malone & Hyde filed suit against Union Thrift Market in the United States District Court for the Eastern District of Missouri seeking a judgment against Union Thrift Market for its failure to pay Malone & Hyde for the groceries it had delivered in a case styled Malone & Hyde, Inc. v. Union Thrift Market, Inc., Cause No. 4:93CV00258CEJ. On April 5, 1993, Robert D. St. Vrain, Clerk of the Court, entered a default against Union Thrift Market in Cause No. 4:93CV00258CEJ. On June 28, 1993, Judge Carol E. Jackson entered a judgment against Union Thrift Market in the sum of $126,153.43 in Cause No 4:93CV00258CEJ.
On February 24, 1993, Malone & Hyde filed suit against Overland Dairy Market in the United States District Court for the Eastern District of Missouri to recover $136,725.58 from Overland Dairy Market; the style of said case was Malone & Hyde, Inc. v. Overland Dairy Market, Inc., Cause No. 4:93CV00503CEJ. On March 24, 1993, Robert D. St. Vrain, Clerk of the Court, entered a default against Overland Dairy Market and on April 29, 1993, he entered a judgment of $136,725.58 against Overland Dairy Market.
By March 1993 Overland Dairy Market, Union Thrift Market, and Pennywise were all closed and no longer in business.

II. Magna Bank Foreclosure
Overland Dairy Market owned the real estate at 8707 St. Charles Rock Rd. in St. Johns, Missouri where the grocery store operated. The property was encumbered by a Deed of Trust in favor of Landmark Bank of St. Charles (which later became Magna Bank) to secure a note. In September, October, and November 1992 Overland Dairy Market failed to make its mortgage payments to Magna Bank. On November 18, 1992 Magna Bank accelerated Overland Dairy Market's loan and declared a default of the loan. It sent a notice of default, to Sanford Rich, via regular and certified mail, return receipt requested, informing him that the Bank was going to proceed with foreclosure. Plaintiff's Exhibit 89.
In December 1992, with the knowledge of Overland Dairy Market via Sanford Rich, Magna Bank had an environmental study conducted at the 8707 St. Charles Rock Rd. property. An abandoned underground storage tank was discovered and had to be removed at the Bank's expense. Once again, Overland Dairy Market via Sanford Rich was advised of the environmental assessment and the removal of the substance in the underground storage tank. Plaintiff's Exhibits 50, 51, and 52.
Magna Bank foreclosed on its Deed of Trust against 8707 St. Charles Rock Rd. on July 15, 1993. The property was later sold at a foreclosure sale for approximately $400,000.00.

III. The Certificates of Deposit Transactions
On or about February 25, 1992 Sanford Rich applied for and received a loan of $59,000.00 from Boatmen's Bank. On February 25, 1992 Boatmen's Bank funded the loan (hereinafter the "Sanford Rich Loan"). The simple interest loan agreement entered into between Sanford Rich and Boatmen's Bank is signed by Sanford Rich alone in his individual capacity. Defendants' Exhibit H-2. The Sanford Rich Loan matured on April 6, 1992.
As collateral for the Sanford Rich Loan, Sanford Rich and his mother, defendant Rose Rich, pledged their Boatmen's Bank Certificate of Deposit (# XXXXXXXXXXXX) in the amount of $59,692.04.
The funds obtained by the Sanford Rich Loan were utilized by the Overland Dairy Stores to cover operating costs.
*1289 On April 14, 1992, the Sanford Rich Loan was replaced by a new loan from Boatmen's Bank to Overland Thrift Market (the "Overland Thrift Market Loan"). The Overland Thrift Market Loan matured on April 14, 1993 at which time a balloon payment of $58,629.26 was due.
As collateral for the Overland Thrift Market Loan, defendants Max and Rose Rich pledged their Certificate of Deposit to Boatmen's Bank (hereinafter the "M/R Rich Certificate of Deposit"). The M/R Rich Certificate of Deposit was in the amount of $60,248.59 and was issued by Boatmen's Bank as Certificate of Deposit # XXXXXXXXXXXX.
By September 1992 the Overland Thrift Market had ceased its retail grocery business and had vacated the premises at 10455 St. Charles Rock Rd. Since it had ceased operations, Overland Thrift Market would not be able to pay the balloon payment on its loan when it came due in April 1993.
On December 28, 1992 the Overland Dairy Stores deposited their cash receipts at St. John's Bank for the sales over the Christmas weekend; the amount of the deposit was $100,005.88. Plaintiff's Exhibit 72. On this same date, at St. John's Bank, Sanford Rich presented a $60,000.00 check drawn on Overland Dairy Market's account to buy a $60,000.00 cashier's check from St. John's Bank. The $60,000.00 cashier's check was payable to Boatmen's Bank and had a number of #231653 (hereinafter the "St. John's Bank Cashier's Check"). Finally, as of this same date of December 28, 1992, an automatic transfer of $62,110.74 from Union Thrift Market's account at St. John's Bank to Overland Dairy Market's account (also at St. John's Bank) was made to cover the $60,000.00 Overland Dairy Market checks as well as other checks that were presented for payment on December 28, 1992. The $60,000.00 cashier's check was used by defendant Sanford Rich to purchase a Certificate of Deposit (the Overland Dairy Market Certificate of Deposit).
On December 29, 1992, Overland Dairy Market pledged the Overland Dairy Certificate of Deposit to Boatmen's Bank as collateral for the Overland Thrift Market Loan, which was secured by the M/R Rich Certificate of Deposit. The Overland Dairy Certificate of Deposit was accepted as substitute collateral by Boatmen's Bank for the M/R Rich Certificate of Deposit; Boatmen's Bank released its security interest in the M/R Rich Certificate of Deposit on January 4, 1993.
On April 14, 1993, Overland Thrift Market defaulted on the Overland Thrift Market Loan, and Boatmen's Bank exercised its rights against the Overland Dairy Certificate of Deposit. After applying the value of the Overland Dairy Certificate of Deposit to the balance due on the defaulted Overland Thrift Market Loan, Boatmen's Bank remitted the remainder of $1570.68 to Overland Dairy Market.

IV. "Rent Payments" to Defendants Max and Rose Rich
Max and Rose Rich owned the real property at 2020 Woodson Road in Overland, Missouri where Pennywise operated its grocery store. Overland Dairy Thrift Market did not pay any rent to either Max or Rose Rich during 1989, 1990, 1991, and 1992. In fact, Max and Rose Rich testified, at their depositions, that Pennywise had never paid any rent to them for use of the real estate at 2020 Woodson Rd. Max and Rose Rich did not report any rental income from Overland Dairy Thrift Market on their 1989, 1990, 1991, and 1992 U.S. Income Tax Returns.
Pennywise closed and ceased operating in early January 1993.
On or about January 22, 1993, Rose Rich received a check from Overland Dairy Thrift Market d/b/a Pennywise in the sum of $5000.00 payable to Max Rich; the check number was 017728. The check was drawn on Pennywise's account (# 452238) at St. John's Bank. This check was endorsed "Max Rich" by Rose Rich and deposited into account # XXXXXXX, a joint account in the name of Max and Rose Rich at Boatmen's Bank.
On or about February 2, 1993, Rose Rich received a check from Overland Dairy Thrift Market d/b/a Pennywise in the sum of $5000.00 payable to Max Rich; the check number was 017749. The check was drawn on Pennywise's account (# 452238) at St. *1290 John's Bank. This check was endorsed "Max Rich" by Rose Rich and deposited into account # XXXXXXXXXXXX, a joint account in the name of Max and Rose Rich at Boatmen's Bank.
On or about February 26, 1993, Rose Rich received a check from Overland Dairy Thrift Market d/b/a Pennywise in the amount of $2500.00; the check number was 017779. This check was drawn on Pennywise's account (# 452238) at St. John's Bank and was payable to Max Rose. Rose Rich endorsed the check "Max Rich" and deposited it into account # XX-XXXX-XXXXXX at Boatmen's Bank. On March 8, 1993 Boatmen's Bank deducted $2500.00 from account # XX-XXXX-XXXXXX because check # 017779 was returned by St. John's Bank.
On or about March 5, 1993 Overland Dairy Thrift Market had a check # 9 in the amount of $2500.00 prepared on an account # XXXXXX at St. John's Bank payable to Max Rich. Check # 9 replaced check # 017779 which was not paid by St. John's Bank.
Max and Rose Rich had no ownership interest in the real estate located at 1301 Union Blvd. in St. Louis, Missouri where Union Thrift Market operated its grocery store. Union Thrift Market is not, and never was, indebted to Max Rich and/or Rose Rich for rent. Union Thrift Market leased the premises at 1301 Union Blvd. from Wetterau Inc. pursuant to a written lease.
On or about March 9, 1993 Rose Rich received a cashier's check from Union Thrift Market in the sum of $2500.00 issued by St. John's Bank. The cashier's check was # 232139 and was made payable to Max Rich. Rose Rich endorsed the check "Max Rich" and deposited it into account # XX-XXXX-XXXXXX, a joint account in the name of Max and Rose Rich at Boatmen's Bank.

V. Creditors' Lawsuits and the Zero Balance Bank Accounts
On October 14, 1992 Brod Dugan and Co. filed suit against Overland Dairy Market in St. Louis County for monies owed; a default judgment was entered against Overland Dairy Market and in favor of Brod Dugan on May 19, 1993. The default judgment entered was for the total amount of $1503.35.
On November 10, 1992 Standard Register Co. filed suit against Overland Dairy Market in St. Louis County for monies owed; a default judgment was entered against Overland Dairy Market and in favor of Standard Register Co. On May 19, 1993. The default judgment entered was for the total amount of $2974.58.
On November 24, 1992 St. Louis Banana and Tomato filed suit in St. Louis County against Overland Dairy Market for monies owed; a default judgment was entered against Overland Dairy Market and in favor of St. Louis Banana and Tomato on March 25, 1993. The default judgment entered was for the total amount of $7108.95.
Beginning on or about November 30, 1992 Overland Dairy Market and Pennywise deposited their sales receipts into Union Thrift Market's account at St. John's Bank.
On November 24, 1992 St. Louis Banana and Tomato filed suit in St. Louis County against Union Thrift Market for monies owed; a default judgment was entered against Union Thrift Market and in favor of St. Louis Banana and Tomato on March 25, 1993. The default judgment entered was in the total amount of $4181.21.
On or about December 2, 1992 defendant Sanford Rich, on behalf of the Overland Dairy Stores, gave written instructions to St. John's Bank to maintain Overland Dairy Market's and Pennywise's accounts at a zero balance and to fund checks presented for payment against these accounts from funds in Union Thrift Market's account. Plaintiff's Exhibit 75. A zero balance account is an active account; however, the balance is maintained at zero. The zero balance account is automatically funded by deposits from another account (not a zero balance account) as checks are presented for payment against the zero balance account. All deposits which would normally be made into the zero balance account(s) are made into the account from which the funds are transferred. It is the customary practice and policy of St. John's Bank to answer garnishment interrogatories against a zero balance account by stating that the balance is zero, and to not attach the funds that are transferred into the *1291 zero balance account. Defendant Sanford Rich was aware of this practice, and testified that he arranged for the zero balance accounts in order to forestall his supplier creditors.
On November 30, 1992 Overland Dairy Market's account was overdrawn in the amount of $22,874.62, and continued to be overdrawn until December 16, 1991 when the overdraft reached $154,944.04. From November 30, 1992 through December 16, 1992 Overland Dairy Market's receipts were deposited into Union Thrift Market's Account, except for a $60,000.00 deposit on December 15, 1992.
On December 16, 1992 St. John's Bank transferred $154,944.04 from Union Thrift Market's account to Overland Dairy Market's account to bring the balance in Overland Dairy Market's account to zero. This was done in compliance with defendant Sanford Rich's instructions to maintain the Overland Dairy Market account as a zero balance account.

VI. Sale of the Mexico, Missouri Farm to Max and Rose Rich
In late November 1992, recognizing a need to generate immediate cash capital for the Overland Dairy Stores, defendant Sanford Rich decided to sell the farm property owned by Overland Dairy Market in Mexico, Missouri.
On November 24, 1992 Overland Dairy Market entered into a Sale Contract with Max and Rose Rich for the conveyance of Overland Dairy Market's real estate in Mexico, Missouri. The Sale Contract price was $222,600.00 and the Sale Contract provided that $95,137.53 be paid in cash at the closing and that Max and Rose Rich assume a Deed of Trust dated August 22, 1989 in favor of First National Bank of Mexico, Missouri in the amount of $127,362.47. Later on November 24, 1992 Overland Dairy Market deeded its real estate in Mexico, Missouri to Max and Rose Rich pursuant to a General Warranty Deed.
On November 24, 1992 Overland Dairy Market received $35,137.53 from Max and Rose Rich in partial payment of the contract price for Overland Dairy Market's real estate in Mexico, Missouri.
On or about December 9, 1992 Overland Dairy Market received $60,000.00 from Max and Rose Rich is the balance of the contract price for Overland Dairy Market's real estate in Mexico, Missouri. On or about December 15, 1992 Max and Rose Rich's check for $60,000.00, payable to Overland Dairy Market, was deposited into Overland Dairy Market's account at St. John's Bank; whereupon the funds were transferred to Union Thrift Market's account pursuant to the zero balance account arrangement initiated by defendant Sanford Rich. Plaintiff's Exhibits 63, 72, and 74.

VII. Foreclosure on the Wetterau Lease
Union Thrift Market was a lessee of Wetterau, Inc. As of November 1, 1992 Union Thrift Market stopped making its rent payments to Wetterau, and was already several months in arrears for rent payments. No further rent payments were made by Union Thrift Market to Wetterau.
Union Thrift Market's lease with Wetterau expired on March 17, 1993. In order to extend its lease beyond the March 17, 1993 expiration date, Union Thrift Market was required, pursuant to the lease terms, to give notice on of before December 17, 1992 (to Wetterau) of its intention to exercise its option to extend the lease term from March 17, 1993 to March 17, 1994. Union Thrift Market did not exercise its option by December 17, 1992 nor anytime thereafter.

VIII. Insolvency of the Overland Dairy Stores
After a complete review of the parties's exhibits, especially Plaintiff's Exhibits 6, 66, 67, 68, 70, and 71, and expert testimony regarding the stores' financial conditions during the relevant time-period, this Court finds that the Overland Dairy Stores were insolvent as of November 1992. It is clear that by November 1992, the financial conditions of the Overland Dairy Stores had deteriorated to the point wherein each store's liabilities exceeded its assets at fair valuation, and was unable to pay it's debts as they came due. This Court concludes that the Overland Dairy Stores were insolvent both under the *1292 recognized equity and bankruptcy tests for insolvency.[7]

CONCLUSIONS OF LAW
Plaintiff has brought this cause of action pursuant to the equitable remedy of a creditor's bill seeking to set aside certain transfers by the Overland Dairy Stores on the grounds of fraudulent conveyances under the Missouri Uniform Fraudulent Transfer Act, Chapter 428 (1994); and to request the Court to use its equitable power to pierce the corporate veil between the Overland Dairy Stores and hold defendant Sanford Rich personally liable for the default judgments previously entered against the stores. Specifically, plaintiff contends that certain "rent payments" and the financial transaction involving the $60,000.00 Overland Dairy Market Certificate of Deposit constituted fraudulent conveyances under § 428.024.1(1) and/or § 428.029.2; and that by virtue of Sanford Rich's corporate control and fraudulent conduct with regard to the stores, the Court should pierce the corporate veils (of all of the Overland Dairy Stores) and hold defendant Sanford Rich personally liable for the default judgments entered against the stores. Plaintiff also seeks punitive damages against defendant Sanford Rich.
Defendants contend the plaintiff has improperly instituted this action as one for a creditor's bill in light of the enactment of the Missouri Uniform Fraudulent Transfer Act. Assuming arguendo, that this action has been properly instituted as one for a creditor's bill, defendants further contend that plaintiff has failed to establish the required elements for piercing the corporate veil of the Overland Dairy Stores and hold defendant Sanford Rich personally liable for the subject outstanding corporate debts. Specifically, defendants argue that Sanford Rich did not exercise the degree of corporate control required to pierce the corporate veils, that plaintiff was aware of the fact that Sanford Rich had expressly stated that he would not personally guarantee any of the corporate debts to plaintiff, and that no scheme took place to defraud plaintiff; i.e. that the subject grocery orders were made in the ordinary course of business. Essentially, defendants argue that plaintiff "assumed the credit risk" when it filled the orders knowing that the stores were in financial distress. Defendants further contend that the "rent payments" were payments of long-outstanding obligations to defendants Max and Rose Rich; and at worst, constituted nothing more than preferential payments. Furthermore, defendants argue that the $60,000.00 Overland Dairy Market Certificate of Deposit transaction was not money stripped from the insolvent stores for personal use by the defendants, but instead originated from the proceeds from the purchase of the Mexico farm by defendants Max and Rose Rich, and used by Overland Dairy Market to purchase a corporate asset (the subject Certificate of Deposit) which was pledged as substitute collateral for a corporate loan. Defendant Sanford Rich contends that he was entitled to use the $60,000.00 as security for the Overland Thrift Loan because, as part of the consideration for the sale of the Mexico farm, he had agreed to release his second deed of trust on the farm which secured an earlier line-of-credit loan defendant Sanford Rich had made to the Overland Dairy stores. Essentially, defendants contend that plaintiff caused its losses by "knowingly selling groceries to a financially distressed corporation and then refusing to enter into any repayment terms and instituting legal action to force the liquidation of Overland's inventory." Finally, defendants argue that plaintiff is time-barred by the one (1) year statute of limitations [§ 428.049(3)] for claiming relief under § 428.029.2 regarding a fraudulent transfer to an insider for an antecedent debt.
*1293 Before embarking upon a review and analysis of the applicable law to the legal issues present in this case, the Court feels it is necessary to address a "theme" prevalent in the defendants' briefs. The defendants expend a considerable amount of time and energy attacking the merits of the default judgments entered against the Overland Dairy Stores. Essentially, the defendants argue that the plaintiff has no right to attempt to collect on the judgments because it was the plaintiff's fault that the losses occurred; i.e. that plaintiff should not have sold groceries to the stores during the relevant time-period or at lease, should have worked out some type of payment plan with the stores and defendant Sanford Rich for the debts incurred.
This Court is not concerned with the merits or the morality of the default judgments entered against the Overland Dairy Stores. Frankly, the time to oppose the judgments has long passed. Defendant Sanford Rich had the opportunity to argue the merits of the underlying actions giving rise to the default judgments, but chose not to appear before Judge Jackson to oppose the entry of the default judgments. This Court is not interested now in any argument by the defendants, which challenges the merits of the default judgments. As far as this court is concerned, the subject default judgments are valid and enforceable; the only real questions are whether assets were transferred in an attempt to circumvent payment of the judgments, whether such actions constitute fraudulent conveyances and finally, whether such actions constitute legal grounds for imposing personal liability upon defendant Sanford Rich for the debt obligations of his stores.

I. Creditor's Bill in Equity
Defendants question the viability of an action for a creditor's bill since the enactment of the Missouri Uniform Fraudulent Transfer Act. They further contend that, assuming arguendo that such an action is still available, that the plaintiff is foreclosed from pursuing this cause of action as one for a creditor's bill because a creditor's bill must be filed as part of the original lawsuit giving rise to the judgment against the debtor. Consequently, defendants contend that plaintiff should have filed a "motion for a creditor's bill" in one or more of the cases which plaintiff (formerly being Malone & Hyde) pursued against the individual Overland Dairy Stores.
In the absence of controlling federal statute, a district court "has the same authority to aid judgment creditors in supplementary proceedings as that which is provided to state court under local law." H.H. Robertson Co. v. V.S. DiCarlo Gen'l Contractors, Inc., 994 F.2d 476, 477 (8th Cir.1993). Missouri recognizes the creditor's bill as a viable remedy in equity. It is a "flexible equitable remedy" available to a creditor to enforce execution of a judgment. Shockley v. Harry Sander Realty Co., 771 S.W.2d 922, 924 (Mo.App.1989) citing Shockley v. Sander, 720 S.W.2d 418, 421 (Mo.App.1986). The Shockley Court provides an extensive review of the substance and purpose of a creditor's bill in equity:
"It is an equitable remedy available to a creditor who seeks to enforce the payment of debts out of assets that cannot be reached by traditional means of execution on a judgment established in a suit at law. The creditor's bill may be brought by an unsecured creditor to set aside a transfer by the debtor on the ground of fraud or to discover the debtor's hidden assets, subjecting that property to the payment of the debt. Creditor's bills have been used frequently over the years in attempts to set aside fraudulent conveyances."
Shockley, 771 S.W.2d. at 924 (citations omitted); see also, Moore v. Campbell, 904 S.W.2d 378, 384 (Mo.App.1995) (citing Shockley, 771 S.W.2d. at 924).
Previously, it was not uncommon for creditors seeking a creditor's bill to cite § 428.020 R.S.Mo. as the basis for setting aside fraudulent conveyances. In 1992, § 428.020 was repealed by L. 1992, S.B. No. 448 § A, effective August 28, 1992, and replaced by the Missouri Uniform Fraudulent Transfer Act. Due to the relatively new passage of the Missouri Uniform Fraudulent Transfer Act, caselaw interpreting and applying it is virtually non-existent. However, it is this Court's opinion and belief, that the *1294 passage of the Act was not meant to extinguish the long-standing equitable remedy of a creditor's bill. Just as repealed § 428.020 was frequently used as the basis for setting aside fraudulent conveyances and obtaining a creditor's bill, this Court believes that the Missouri Uniform Fraudulent Transfer Act may be used in the same manner.
The Court disagrees that plaintiff is barred from bringing this action for a creditor's bill as a separate lawsuit. Contrary to the defendants' assertions, the Shockley Court did not hold that an action for a creditor's bill must be filed in the original lawsuit against the judgment debtor. The case simply analyzed the applicable statutes of limitations with regards to the plaintiff creditor's claims for relief. The Court held that a five year statute of limitations barred a second lawsuit seeking a second judgment based upon direct contractual liability of the defendants, but that the five year statute of limitations did not bar an independent action for a creditor's bill which sought enforcement of the original judgment by asserting that assets had been fraudulently conveyed and that the defendants should be held personally liable for the corporate debts under an "alter ego" theory. Shockley, 771 S.W.2d. at 924-25.
As in the Shockley case, plaintiff is seeking to enforce the judgments entered against the corporate entities by having certain conveyances voided as fraudulent and having the individual defendant Sanford Rich held personally liable for the corporate debts by "piercing the corporate veil". The Court finds that no procedural bar[8] exists to the maintenance of the instant cause of action.

II. Fraudulent Conveyances
It is undisputed that Missouri law applies in this diversity case. Plaintiff has brought this action for a creditor's bill asserting that certain conveyances of assets were fraudulent under the Missouri Uniform Fraudulent Transfer Act, Chapter 428 of the Revised Statutes of Missouri (1994).
The Missouri Uniform Fraudulent Transfer Act (hereinafter referred to as simply "MoUFTA") is patterned after the Uniform Fraudulent Transfer Act first approved by the National Conference of Commissioners on Uniform Laws in 1984.[9] The purpose of the MoUFTA is to prevent the depletion of a debtor's estate to the detriment of its unsecured creditors. It provides unsecured creditors with a means of relief in the event the debtor engages in transactions designed to conceal assets or place them beyond the reach of the unsecured creditors seeking to satisfy their claims.
The MoUFTA contains two provisions under which an unsecured creditor may pursue fraudulent transfers of assets of a debtor's estate. These two provisions are distinguished by the status of the unsecured creditor: § 428.024 R.S.Mo. is available to both present and future creditors; i.e. creditors whose claims were in existence at the time the transfer was made or the obligation was incurred, or creditors whose claims arose after that point; and § 428.029 R.S.Mo. is available only to creditors whose claims were in existence at the time of the transfer or obligation in question.
Section 428.024.1(1) provides in pertinent part that a transfer by a debtor is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation "with actual intent to hinder, delay, or defraud any creditor of the debtor." The Act provides guidelines for determining whether there was fraudulent intent on the part of the debtor. Eleven factors for consideration in making this determination are as follows:
1) The transfer or obligation was to an insider;

*1295 2) The debtor retained possession or control of the property transferred after the transfer;
3) The transfer or obligation was disclosed or concealed;
4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5) The transfer was of substantially all the debtor's assets;
6) The debtor absconded;
7) The debtor removed of concealed assets;
8) The value of the consideration received by the debtor was reasonable equivalent to the value of the asset transferred or the amount of the obligation incurred;
9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred;
10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
§ 428.024.2 R.S.Mo.
Section 428.029.2 R.S.Mo. provides that a transfer is fraudulent as to a present creditor "if the transfer was made to an insider for an antecedent debt, that debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."
The MoUFTA defines several key terms utilized in its provisions. An "asset" is any property of the debtor; however, it does not include property encumbered by a valid lien, property generally exempt under nonbankruptcy law, or an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant. § 428.009(2)(a)-(c) R.S.Mo. An "insider" of a corporate debtor includes a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is a general partner, a general partner in the aforementioned partnership, and/or a relative of a general partner, director, officer, or person in control of the debtor. § 428.009(7)(b)(a)-(f) R.S.Mo. A "transfer" is considered to be "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance". § 428.009(12) R.S.Mo.
An important concept incorporated in the MoUFTA is the matter of the "insolvency" of the debtor. "Insolvency" is defined as follows:
1) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair market value.
2) A debtor who is generally not paying his debts as they become due is presumed to be insolvent.
3) A partnership is insolvent under subsection 1 of this section if the sum of the partnership's debts is greater that the aggregate, at a fair valuation, of all of the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.
4) Assets under this section do not include property that has been transferred, concealed or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under sections 428.005 to 428.059.
5) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.
§ 428.014 R.S.Mo. Under § 428.014, both the encumbered property and the secured debt (i.e. the valid lien) are excluded from the determination of insolvency. Furthermore, the MoUFTA creates a rebuttable presumption of insolvency as it concerns the fact issue as to whether the debtor is generally not paying debts as they come due.
The MoUFTA offers a different concept of value than that which is normally associated within the area of contract law; i.e. consideration. *1296 As correctly noted by Mr. Buckley,[10] in contract law, a transaction or conveyance is deemed valid and enforceable if there is some consideration to support the transaction. However, with regard to fraudulent conveyance law, in order for a transaction to be considered valid and enforceable, there must be some "reasonably equivalent" benefit given in exchange for the conveyance of the asset. The MoUFTA defines "value" as:
1) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
2) For the purposes of subdivision (2) of subsection 1 of section 428.024 and section 428.029, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.
3) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.
§ 428.019 R.S.Mo. The MoUFTA fails to define "reasonably equivalent".
The remedies available to creditors under the MoUFTA include the avoidance of the transfer or obligation at issue, the imposition of an injunction to prevent further disposition of the property transferred or the debtor's other assets, the appointment of a receiver to operate the debtor's business or property, and/or other relief deemed appropriate by the court. § 428.039 R.S.Mo. Nowhere in the MoUFTA are these remedies deemed exclusive of any other remedies, especially as regards post-judgment remedies.
The MoUFTA provides a multitude of defenses for transferees, including transferees that might be considered "insiders". An absolute defense to a fraudulent conveyance action is where the transferee took in good faith and exchanged reasonably equivalent value for the conveyance. § 428.041.1 R.S.Mo. Section 428.044.2 provides that the creditor may recover a judgment for the value of the asset transferred or the amount necessary to satisfy the outstanding debt, whichever is less. Section 428.044.3 provides that if the claimed debt exceeds the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer subject to "adjustment as the equities may require." Section 128.044.4 provides that a "good faith transferee" is entitled, to the extent of the value given the debtor at the time of the transfer, to a lien upon or right to retain an interest in the transferred asset, enforcement of any obligation incurred as a result of the transaction, or a reduction in the amount of the liability to the judgment creditor. As regards insider transactions, the MoUFTA provides that the insider transferee may set off the new vague subsequently advanced to the debtor without security against transferred asset. § 428.044.6(1) R.S.Mo. Furthermore, insiders are exempt from liability for those transfers made in the ordinary course of business or financial affairs of both the debtor and the insider. § 428.044.6(2) R.S.Mo. Finally, a transfer is not voidable if made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as the antecedent debt of the debtor. § 428.044.6(3) R.S.Mo.
The MoUFTA sets forth specific time-limitations for actions brought under its provisions. As regards actions brought under § 428.024.1(1) alleging actual fraud, the creditor must bring suit within four (4) years after the transfer is made or the obligation is incurred, or if later, within one (1) year after the transfer or obligation was or could reasonably be discovered. § 428.049(1) R.S.Mo. Actions brought under §§ 428.024.1(2) or 428.029.1 alleging some form of constructive *1297 fraud, must be brought within four (4) years after the transfer was made or the obligation was incurred. § 428.049(2) R.S.Mo. Actions filed against insiders under § 428.029.2 must be brought within one (1) year after the transfer was made or the obligation was incurred. § 428.049(3) R.S.Mo.
The Court has carefully reviewed all of the provisions of the MoUFTA as well as a myriad of cases interpreting and applying repealed § 428.020 R.S.Mo. The Court concurs with Mr. Buckley's observations and concluding remarks:
"The UFTA is a significant development in Missouri's commercial law. The UFTA provides a means of relief in the event either intentional fraud or constructive fraud is perpetrated upon a debtor's unsecured creditors. The Act contains indicia or modern day badges of fraud, which can be used by the court as guidelines to determine whether the debtor intended to delay, hinder, or defraud creditors that would subject the subject transfer or obligation to avoidance. Unlike the prior law, the Act makes it clear that these factors or badges of fraud are mere relevant evidence to be considered by the court and are not presumptive of the debtor's actual intent. Furthermore, the Act provides statutory relief to creditors in the event of a constructive fraud (i.e., where the debtor transfers property or incurs an obligation that depletes the assets available to satisfy unsecured creditors' claims). Furthermore, under the UFTA, insiders may be targeted for preference actions outside the context of bankruptcy proceedings where transfers are made by an insolvent debtor to the insider. Unlike Missouri's prior fraudulent conveyance law, the Act clearly defines when a transfer obligation has occurred and provides a specific statute of limitations."
50 Mo.B. 89, 93 (1994). Although there are some significant differences between the MoUFTA and the prior fraudulent conveyance law, the Court believes that caselaw interpreting and applying the prior law is still helpful in addressing the issues present in this case. For example, as Mr. Buckley notes, the MoUFTA codifies the "badges of fraud" frequently cited and applied by the Missouri courts when determining the presence of fraud under the prior fraudulent conveyance law. Consequently, the Court will apply portions of prior court decisions (addressing issues related to fraudulent conveyance under repealed § 428.020 R.S.Mo.) when it believes such prior holdings and analysis still hold viable legal precedential value.
Under § 428.024 R.S.Mo., a conveyance may be set aside as fraudulent to the creditor if it is shown that such as conveyance was made with the actual intent to hinder, delay or defraud creditors. The intent to defraud must be proven by clear and convincing evidence. Dickinson, et. al. v. Ronwin, et. al., 935 S.W.2d 358, 363 (Mo.App. 1996) citing South Side National Bank in St. Louis v. Winfield Fin.Serv., 783 S.W.2d. 140, 143 (Mo.App.1989); Behr v. Bird Way, 923 S.W.2d 470, 473 (Mo.App.1996); Citizens National Bank of Maryville v. Cook, 857 S.W.2d 502, 505 (Mo.App.1993).[11] Fraudulent intent is rarely manifested by direct evidence, thus, the Missouri courts have "recognized that there are certain circumstances referred to as badges of fraud which so frequently attend conveyances to hinder, delay or defraud creditors that they may be employed to determine the presence of fraud." Dickinson, at 364; Behr, at 473; Mark Twain Kansas City Bank v. Riccardi, 865 S.W.2d 425, 427 (Mo.App.1993).[12] Although none of the badges standing alone will establish fraud, *1298 the existence of several of them will raise a presumption of fraud. Dickinson, at 364; Behr, at 473; Riccardi, at 428.

A. Pennywise's "rent" payments to Max and Rose Rich
Defendants assert that the $10,000.00 transferred from Pennywise to defendants Max and Rose Rich, subsequent to the closing of the store, constituted "delayed rental payments". Defendants assert that defendant Sanford Rich did nothing more than make a choice of one creditor over another creditor; i.e. that he chose to make payments towards the outstanding debts owed to his parents than toward the outstanding debt owed to plaintiff.
Defendants Max and Rose Rich are the parents of defendant Sanford Rich, the sole shareholder director, and officer of each of the subject Overland Dairy Stores. Consequently, defendants Max and Rose Rich are "insiders" as that term is defined in the MoUFTA. At the time of the payments, Pennywise was insolvent. It is undisputed that Pennywise was unable to pay for the groceries it had ordered the last two weeks of December 1992. On December 2, 1992 defendant Sanford Rich directed St. John's Bank to convert Pennywise's account to a zero balance account. Furthermore, defendant Sanford Rich had made the decision in mid-December 1992 to close the Pennywise store, and in fact, the store closed and ceased operating in early January 1993.
Both Max and Rose Rich testified at their depositions that they had never asked nor received any "rent" from Pennywise. It is apparent from their depositions that they did not believe that any lease arrangement existed between themselves and Pennywise. Their tax records clearly show that rental income had never been declared by them for several years prior to the closing of the store, including for the taxable year 1993. Finally, at their depositions, they failed to disclose receipt of these payments in any form.
Although some type of lease arrangement may have existed between Pennywise and Max and Rose Rich[13], it is clear that the provisions of the lease were never formally carried out. It is also surprising that "rent" payments would be made after a period of insolvency and after a store had closed. If rent was indeed owed to Max and Rose, it is strange that such a debt was not paid during the years the store was profitable, or at least, in business. Given the suspect circumstances, the Court finds that such payments were not made as back-owed "rent" but instead constitute the fraudulent conveyance of Pennywise's assets. Pennywise's payments of $10,000.00 to defendants Max and Rose Rich were made with the actual intent to hinder, delay, and defraud plaintiff, and thus, were fraudulent transfers proscribed by § 428.024 R.S.Mo. and void under § 428.039 R.S.Mo.

B. Union Thrift Market's Payment to Defendants Max and Rose Rich
On March 9, 1993 Union Thrift Market made a payment of $2500.00 to defendants Max and Rose Rich. Max and Rose Rich are "insiders" as that term is defined under the MoUFTA.
At the time of the conveyance, Union Thrift Market had closed. It owed money to the plaintiff for groceries ordered and received during the last two weeks of December 1992. On December 2, 1992 defendant Sanford Rich had informed St. John's Bank that Union Thrift Market's account was to be maintained as a zero balance account. Meanwhile, St. Louis Banana and Tomato had filed suit against Union Thrift Market for monies owed. By February 1993 Union Thrift Market had closed and ceased operating as a grocery store.
*1299 No credible explanation was offered at trial for this payment to defendants Max and Rose Rich. No lease arrangement whatsoever existed between the parties. Defendants Max and Rose offered no credible explanation at their depositions for the payments.
This payment was made when Union Thrift was insolvent, and had ceased its business operations. Defendants have offered no credible Evidence that explains the purpose of the payment. Consequently, Union Thrift Market's payment of $2500.00 to defendants Max and Rose Rich constituted a fraudulent conveyance of Union Thrift Market's assets. Said payment was made with actual intent to hinder, delay, and defraud plaintiff, and thus, was a fraudulent transfer proscribed by § 428.024 R.S.Mo. and void under § 428.039 R.S.Mo.

C. Overland Dairy Market's $60,000.00 Certificate of Deposit Transaction
Plaintiff contends that Overland Dairy Market's pledge of its $60,000.00 Certificate of Deposit as substitute collateral for the Overland Thrift Market loan was a fraudulent transfer proscribed by either § 428.024.1(1) or § 428.029.2 R.S.Mo. It argues that Overland Dairy Market's pledge of its $60,000.00 Certificate of Deposit as substitute collateral for defendants Max and Rose Rich's Certificate of Deposit was a fraudulent transfer because Overland Dairy Market was insolvent at the time, Max and Rose Rich benefited from the transaction because their Certificate of Deposit was no longer at risk, Overland Dairy Market owed a substantial debt to plaintiff at the time, and Overland Dairy Market received no benefit from the transaction because its assets were placed in jeopardy. Furthermore, plaintiff argues that no outstanding debt by Overland Dairy Market was owed to Sanford Rich which would entitle him to use the $60,000.00 for the benefit of his parents. Plaintiff seeks to hold either Sanford Rich or his parents, Max and Rose Rich, liable for the transaction.
Defendants contend that the Overland Dairy Market Certificate of Deposit transaction is not void under § 428.024.1(2) because the pledge of the certificate was made in consideration of reasonably equivalent value in the form of a release of the second Deed of Trust and forgiveness of an underlying debt owed to defendant Sanford Rich by Overland Dairy Market. Furthermore, defendants contend that the transaction is not void under § 428.029.1 because the claim of fraudulent conveyance is untimely. Finally, defendants contend that the $60,000.00 used to purchase the Overland Dairy Market Certificate of Deposit was not an asset of Overland Dairy Market because the money was derived from a portion of the proceeds of the sale of property properly encumbered by a valid lien.
Section 428.024.1(2) provides in full as follows:
1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(b) Intended to incur, or believed or reasonably believed that he would incur, debts beyond his ability to pay as they became due.
As previously noted, "asset" as defined under the MoUFTA, does not include property of a debtor to the extent it is encumbered by a valid lien. § 428.009(2)(a) R.S.Mo.
As previously noted, § 428.049(3) R.S.Mo. provides that any claim brought under § 428.029.2 R.S.Mo. is extinguished unless brought within one (1) year of the transfer or obligation incurred.
Prior to reviewing the legal soundness of the convoluted transaction involving the sale of the Mexico farm and the subsequent use of the sale proceeds, the Court must first establish the matter at issue. The actual sale of the farm is not at issue here; what is *1300 at issue is the defendants's use of the $60,000.00 portion of the sales proceeds.
Firstly, under the plain language of the statute, the cash proceeds of a real estate sale do constitute "assets" as that term is defined. Only the encumbered real estate is protected from creditors; not the monies generated by its sale. Defendants provide no caselaw which supports their argument that proceeds of a sale of property subject to a second Deed of Trust (which in and of itself is not a reachable asset under the MoUFTA) also must be considered as a "non-asset" of the debtor.
Secondly, defendants provide no support for their argument that the one (1) year deadline set forth in § 428.049(3) is jurisdictional. Finding nothing to the contrary, and consistent with Missouri law, the Court finds that the statute of limitation(s) as set forth in the MoUFTA are not jurisdictional, and thus, are subject to waiver, estoppel, and equitable tolling. Plaintiff contends that its claim under § 428.029.2 is not time-barred because defendant Sanford Rich fraudulently concealed the $60,000.00 as an alleged loan payment by Overland Dairy Market. After reviewing the pleadings and the trial testimony and exhibits, the Court concurs and finds that the one (1) year statute of limitations, as contained in § 428.049(3) R.S.Mo., was tolled until such time plaintiff discovered the fraud. Furthermore, plaintiff filed its claim against defendant Sanford Rich within one (1) year of discovering the fraudulent concealment of the conveyance.
As already noted, the Overland Dairy Stores were insolvent by November 1992. The only real asset[14] was the Mexico farm owned by Overland Dairy Market. The farm had been in the Rich family for many years and it is clear that retention of the farm by the Rich family was in jeopardy. It is clear to this Court that it was imperative that the farm be protected, and at the same time, eliminate the risk of losing defendants Max and Rose Rich's Certificate of Deposit to the bank. It is this Court's considered opinion that defendant Sanford Rich concocted an elaborate scheme to accomplish both goals to the detriment of plaintiff.
Overland Dairy Market was the owner of the Mexico farm. On December 15, 1992, as payment of balance due for the sale of the farm, defendants Max and Rose Rich tendered a check for $60,000.00 to Overland Dairy Market. This check was specifically made payable to Overland Dairy Market, not defendant Sanford Rich in his individual capacity. The check was initially deposited into Overland Dairy Market's bank account, then transferred to Union Thrift Market's account. This was the only deposit made directly into Overland Dairy Market's account subsequent to the account becoming a zero balance account on December 2, 1992.
There is no question that on December 28, 1992 Overland Thrift Market would not be able to repay its loan on April 14, 1993 to Boatmen's Bank, when it came due. The store had closed in September 1992, and had ceased operating as a grocery store. Consequently, there was no doubt that defendants Max and Rose Rich would lose their $60,000.00 Certificate of Deposit come April 14, 1993. Furthermore, on December 28, 1992, it was clear that Overland Dairy Market was insolvent and was in debt to the plaintiff.
However, instead of utilizing the proceeds of the farm sale to reduce Overland Dairy Market's outstanding debt to plaintiff, defendant Sanford Rich surreptiously converted the proceeds for his own use. Without informing the Overland Dairy Stores' comptroller, Richard Eye, he had $60,000.00 in funds transferred from Union Thrift Market's account to Overland Dairy Market's zero balance account to cover a $60,000.00 cashier's check he had drawn on Overland Dairy Market's account. On December 29, 1992, again without notifying Eye, defendant Sanford Rich used the cashier's check to purchase a Certificate of Deposit which he pledged as substitute collateral for his parents' Certificate of Deposit. It was no coincidence that the maturity date of the Overland *1301 Dairy Market Certificate of Deposit was April 14, 1993, the same date that the Overland Thrift Market loan came due.
The upshot of all this manipulation is that defendants Max and Rose Rich's Certificate of Deposit was rescued from certain redemption by the bank; while $60,000.00 of Overland Dairy Stores' scarce revenue was now placed in the same jeopardy of loss to the bank at a time when a considerable debt was owed to plaintiff. There was no benefit to Overland Dairy Market from this transaction, a fact recognized by defendants' own expert, Jonathan Becker. The only ones to benefit from this transaction were the defendants, especially Max and Rose Rich; another fact recognized by Mr. Becker.
Sanford Rich's argument that the $60,000.00 was a repayment of a loan he had made in August and September 1988, as well as in September 1992, is unequivocably contradicted by Koppermans' balance sheets and its 1993 United States tax return form. Firstly, Overland Dairy Market was not indebted to defendant Sanford Rich personally; rather it was indebted to Koppermans for the infusion of capital. The Court finds the Promissory Notes and Deed of Trust purportedly executed by defendant Sanford Rich extremely suspect, if not outright fraudulent. As previously pointed out, the notes, including the Line of Credit Note, bear only Sanford Rich's signature, yet lack any notarization as to signature or date of the documents. There is absolutely no independent or objective evidence which collaborates Sanford Rich's contention that Overland Dairy Market owed him personally $70,000.00. All of the evidence admitted clearly shows that the legal source of the $50,000.00 advanced in 1988 and the $20,000.00 advanced in 1992 was Koppermans. Koppermans recognized this debt on its balance sheets; on the 1992 balance sheet the debt is highlighted as "Note Receivable  Overland". Jonathan Becker, who prepared Koppermans and Overland Dairy Market's 1993 tax returns testified that Koppermans took a bad debt deduction for the entire $70,000.00 "Note Receivable  Overland" (plus accrued interest) because Overland Dairy Market had not paid the $70,000.00. This is reflected by the fact that no payments whatsoever by Overland Dairy Market are reflected on Koppermans' 1992 and/or 1993 balance sheets.[15]
Finally, defendant Sanford Rich argues that the transaction is not void as a fraudulent conveyance because Overland Dairy Market received reasonably equivalent value for its pledge of the $60,000.00 Certificate of Deposit; i.e. release of defendant Sanford Rich's second Deed of Trust, forgiveness of the $70,000.00 debt by defendant Sanford Rich, and "an injection of $35,000.00 in cash from the sale of the farm, to which Sanford Rich would have been entitled under the second deed of trust." This argument lacks merit.
After reviewing all of the trial evidence, including all admitted exhibits and trial testimony, the Court concludes that the 1988 Line of Credit Promissory Note and the Deed of Trust (allegedly encumbering the Mexico farm, along with a first Deed of Trust held by the First National Bark of Mexico, Missouri) are not credible evidence documenting the existence of the alleged loan transaction between defendant Sanford Rich and Overland Dairy Market. Thus, the release of the first Deed of Trust and Overland Dairy Market's alleged debt to defendant Sanford Rich fails to qualify as "reasonably equivalent value". As for as the $35,000.00 cash received by Overland Dairy Market for *1302 the sale of the farm, it hardly can be said that the receipt of this cash constitutes "reasonably equivalent value" in exchange for the risk and ultimate loss of $60,000.00 by Overland Daily Market.
Although the Court believes that the entire farm sale transaction took place under very suspicious circumstances, the Court believes that only defendant Sanford Rich can be held liable for the fraudulent conveyance of the $60,000.00. Little evidence was produced by either the plaintiff or the defendants as to Max and Rose Rich's state of mind and actions regarding this transaction. It is clear from their depositions[16] that all they were interested in doing was saving the family farm from foreclosure by the Overland Dairy stores' creditors (or perhaps, from defendant Sanford Rich's creditors) or prevent its sale to strangers. No one disputes that the sale contract price was for the fair market value of the real estate. Although they benefited from the substitution of Overland Dairy Market's Certificate of Deposit for their Certificate of Deposit, it was defendant Sanford Rich who carried out all of the financial transactions associated with the substitution of the collateral. Plaintiff failed to produce any evidence which clearly shows that defendant Max and Rose Rich had the requisite actual intent to defraud other than the fact that they were insiders. Unlike the "rent payments" there was no evidence adduced which clearly demonstrated that Max and Rose Rich attempted to conceal their payment of the $60,000.00 to Overland Dairy Market or that they were aware of their son's actions in using that money to their benefit and Overland Dairy Market's detriment.
However, this Court finds that the credible evidence clearly shows that defendant Sanford Rich acted with the actual intent to defraud plaintiff. He deliberately engaged in this elaborate scheme to save his parents' Certificate of Deposit. He knew that Overland Thrift Market would default on the loan secured by his parents' Certificate of Deposit. He also knew that as of December 28-29, 1992, Overland Dairy Market was insolvent (having been so for quite awhile); thus, it too would default on the Overland Thrift Market loan. He took control of the $60,000.00, converted it into a Certificate of Deposit, and pledged it as substitute collateral without telling Richard Eye, the Controller of Overland Dairy Market, and with full knowledge that Overland Dairy Market was insolvent and had an outstanding debt to the plaintiff. Consequently, Overland Dairy Market's payment of $60,000.00 to defendant Sanford Rich was a fraudulent conveyance pursuant to § 428.029.2 R.S.Mo.

III. Piercing the Corporate Veil
Plaintiff seeks to enforce its judgments against the Overland Dairy Stores by "piercing the corporate veil" and having this Court hold defendant Sanford Rich personally liable for the subject judgments. Plaintiff contends that defendant Sanford Rich's control and dominance of the stores' operations and financial transactions establishes that the stores were not separate and independent corporate entities, and that his actions alone created the liability for which the subject judgments were entered. Defendants contend that the evidence adduced is not sufficient, as a matter of law, to warrant such piercing and hold defendant Sanford Rich personally liable for his stores' debts.
Under Missouri law, a corporation is generally viewed as a wholly and separate legal entity, distinct from the persons who compose it. Thomas Berkeley Consulting Engineer, Inc. v. Zerman, 911 S.W.2d 692, 695 (Mo.App.1995). Thus, a person injured by the conduct of a corporation or one of its employees is normally limited to seeking recovery for injuries sustained from the assets of the employee or the corporate employer, and not the corporate shareholder(s). Radaszewski by Radaszewski v. Telecom Corp., 981 F.2d 305, 306 (8th Cir.1992). However, "[a] court may, pursuant to its equitable powers, `disregard the separate legal entity of the corporation and the individual where the separateness is used as a subterfuge to defraud a creditor.'" Gevers Heating & Air Conditioning v. R. Webbe Corp., 885 S.W.2d 771, 773 (Mo.App. *1303 1994) quoting Schlingman v. Reed, 750 S.W.2d 501, 504 (Mo.App.1988). The injured party must convince the court to "pierce the corporate veil" in order to reach the assets of one or more shareholders whose conduct has created the liability. "The rationale behind piercing the corporate veil is that when a controlling entity or individual misuses the controlled corporation for the controlling entity's own purposes, rather than the purposes of the controlled corporation, it loses the limited liability privilege and the debts of the controlled corporation become the obligations of the controlling entity or individual." Dwyer v. ING Investment Co., Inc., 889 S.W.2d 902, 904 (Mo.App.1994).
It appears that the Missouri courts apply two tests interchangeably in order to determine whether the corporate veil should be pierced. One test, commonly referred to as the instrumentality test, requires that the plaintiff show:
1. Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
2. Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
3. The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
Sansone v. Moseley, 912 S.W.2d 666, 668-69 (Mo.App.1995) citing Collet v. American National Stores, Inc., 708 S.W.2d 273, 284 (Mo. App.1986); Dwyer, at 904; see also, Radaszewski, at 306. The other test regularly applied by the Missouri courts is the alter ego test. Under the alter ego test, "when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it, then the court will disregard the corporate form if to retain it would result in injustice." Gevers Heating & Air, at 773. To pierce the corporate veil under the alter ego test, a plaintiff must show: first, the corporation must be controlled and influenced by persons or another corporation; second, evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud. Thomas Berkeley Consulting Engineer, at 695-96; Dwyer, at 904-05; Gevers, at 773-74; Swall v. Custom Automotive Services, Inc., 831 S.W.2d 237, 239 (Mo.App.1992). Although not specifically set out in the standard two-prong alter ego test, as with the instrumentality test, implicit in the alter ego test is a "proximate clause" element, i.e. that the wrong done be the proximate cause of the injury to the third person who dealt with the corporation. Gevers Heating & Air, at 774 citing Dave Kolb Grading, Inc. v. Lieberman Corp., 837 S.W.2d 924, 937 (Mo.App. 1992).
In order to determine whether or not the corporate veil should be pierced, the courts consider a number of different indicators which they believe "justify the inference that they [the indicators] occurred for an improper purpose." Dwyer, at 905. These indicators, include but are not limited to, operating a corporation without sufficient funds to meet its obligations, Dwyer, at 905; the transfer by the debtor corporation of its property to a second corporation when both are controlled by the same person, Gevers Heating & Air, at 773; and/or the manipulation or stripping of assets to avoid the demands of creditors, Sansone, at 669; Dwyer, at 905; Swall, at 240; Collet, at 287.
Although it appears from the Third Amended Complaint and the evidence adduced at trial that plaintiff is pursuing an alter ego theory to support its request to pierce the corporate veil(s) of the Overland Dairy Stores, it really doesn't matter which test the Court applies, because under both tests, the Court finds that the corporate veil(s) should be pierced and defendant Sanford Rich held personally liable for each of the three (3) default judgments rendered in Judge Jackson's court.
The Overland Dairy Stores were wholly owned by defendant Sanford Rich. He was the sole shareholder, director, and corporate *1304 officer. He alone controlled the financial affairs of the stores. No creditors were paid unless Sanford Rich approved the payment. He controlled the bank accounts for the stores and he alone decided the manner in which the bank accounts operated. Defendant Sanford Rich made all significant corporate decisions which affected the business operations of the stores. By his own testimony, he decided in December 1992 to convert Overland Dairy Market and Pennywise's bank accounts to zero balance accounts in order to thwart creditors' attempts to garnish or attach the money in these accounts.
Defendant Sanford Rich argues vehemently that he did not have the dominance and control necessary to allow this Court to pierce the corporate veil because he did not manage the individual stores in their daily operation, such as in ordering groceries. The fact that defendant may not have been involved in the routine ordering of stock for his stores prior to December 1992 does not alter the Court's determination. The credible evidence indicates that defendant directed his store managers to increase their December 1992 orders knowing full well that there was little or no cash on hand to pay for these groceries. In past years, December orders were large because the stores stayed open during the holidays and sales justified the large volume of inventory on the shelves. However, in December 1992, the Overland Dairy Stores were on the brink of financial collapse. Trade creditors had filed lawsuits seeking monies owed. Overland Dairy Market had long ceased making its mortgage payments to Magna Bank, and the Bank had begun taking steps toward foreclosure. Union Thrift Market had long ceased making its rent payments to Wetterau and defendant Sanford Rich had opted not to exercise its option to renew its lease. Pennywise was in such dire financial straits that defendant Sanford Rich had made the decision to close the store in a matter of weeks. As noted before, defendant Sanford Rich had converted Overland Dairy Market and Pennywise's bank accounts to zero balance accounts so that creditors could not reach funds via these accounts. In fact, things were so bleak, defendant Sanford Rich had consulted and paid a $10,000.00 retainer to the law firm of Danna and Shaw to advise him as to a possible bankruptcy filing on behalf of the stores.
Given the circumstances existing by mid-December 1992, no reasonable businessman would have directed such large orders for these stores without an ulterior motive. This wasn't just bad judgment on the part of defendant Sanford Rich. This was a calculated decision and scheme to defraud plaintiff by overstocking his groceries shelves in order to generate enough sales, thus, enough money, not to pay plaintiff or other creditors, but to divert money to his parents and himself.
It is clear that in mid-December 1992 plaintiff was operating his stores without sufficient funds to meet the stores' obligations. Furthermore, he was manipulating the assets in the stores' bank accounts with the avowed intention to avoid paying his creditors. Finally, it is clear that defendant Sanford Rich purposefully ordered the groceries at issue without any intention of paying for them, but instead to generate enough cash for his personal use. Despite the insolvency of the stores, he still continued to collect his salary, and pay debts allegedly owed to himself and his parents.
Defendant contends that by paying himself and his parents he was simply exercising a preference of creditors. However, given the circumstances under which he manipulated the assets, the Court rejects defendant's assertion that he properly exercised a business decision as to which creditors to pay and which not to pay. As stated before, plaintiff purposefully defrauded plaintiff in order to pay his preferred creditors: himself and his parents. The Court rejects this act as a proper business decision and determines that it was further evidence of improper manipulation of corporate assets. See, Dwyer, at 905; Swall, at 241; South Side National Bank in St. Louis v. Winfield Financial Services Corp., 783 S.W.2d. 140, 145 (Mo. App.1989).
The Court will exercise its equitable powers and pierce the corporate veils between Overland Dairy Market, Union Thrift Market, and Pennywise, and defendant Sanford Rich; and hold defendant Sanford Rich personally *1305 liable to plaintiff Fleming Companies, Inc. for its judgments against Overland Dairy Market, Union Thrift Market, and Pennywise.
The Court further finds that there was no valid business reason for plaintiff to have caused the Overland Dairy Stores to order the groceries which are the basis of the subject default judgments; nor for the Overland Daily Market Certificate of Deposit transaction and the payments to defendants Max and Rose Rich. The Court determines that defendant Sanford Rich's fraudulent conduct of causing the Overland Dairy Stores to order $315,110.43 worth of groceries from plaintiff, knowing that the stores were insolvent, on the brink of bankruptcy, and unable to pay its obligations, while at the same time scheming to and in fact did so strip the stores of their cash assets which were needed to pay plaintiff, was deliberate and done with evil motive and/or reckless indifference to the rights of plaintiff. The Court finds that plaintiff Fleming Companies, Inc. is entitled to punitive damages in the amount of $100,000.00 to be assessed against defendant Sanford Rich.
In conclusion, the Court finds that:
1) Judgment shall be entered against defendants Max and Rose Rich, jointly and severally, and in favor of plaintiff Fleming Companies, Inc. for the amount of $12,500.00, plus prejudgment interest from March 15, 1993.
2) Judgment shall be entered against defendant Sanford Rich, and in favor of plaintiff Fleming Companies, Inc., in the amount of $60,000.00, plus prejudgment interest from December 29, 1992.
3) The corporate veils of the Overland Dairy Market, Union Thrift Market, and Pennywise stores shall be pierced, and defendant Sanford Rich shall be held personally liable for the default judgments entered against these stores in the total amount of $315,110.43, plus prejudgment interest from January 8, 1993.
4) A judgment for punitive damages in the amount of $100,000.00 shall be awarded in favor of plaintiff Fleming Companies, Inc. and against defendant Sanford Rich.
NOTES
[1] This cause of action was originally filed by plaintiff Malone & Hyde, Inc. On December 31, 1994, subsequent to the filing of this cause of action, Malone & Hyde was merged into Fleming Companies, Inc. On February 23, 1995 this Court allowed the substitution of Fleming Companies as party plaintiff. Although the pleadings switch back and forth as to the named plaintiff, and the Court's opinion will virtually always refer to Malone & Hyde as the plaintiff, this memorandum opinion will retain Fleming Companies as the named plaintiff in the caption for administrative purposes.
[2] The four stores involved in this litigation are as noted: Overland Dairy Market, located at 8787 St. Charles Rock Rd. in St. Johns, Missouri; Union Thrift Market, located at 1301 Union Blvd. in St. Louis, Missouri; Overland Dairy Thrift Market, located at 2020 Woodson Rd. in Overland, Missouri; and Overland Thrift Market, located at 7711 St. Charles Rock Rd. in St. Ann, Missouri.
[3] Since the four subject stores have such similar names, which adds to the confusing nature of the financial transactions disputed in this case, the Court will attempt to minimize the confusion by referring to the Overland Dairy Thrift Market as "Pennywise" whenever possible.
[4] In several instances, duplicate exhibits have been filed by the parties. For purposes of clarity and convenience only, the Court will cite, when necessary, only to one of the filed exhibits.
[5] The debt obligations at issue in this case are those incurred by Overland Dairy Market, Union Thrift Market, and Pennywise.
[6] The following weeks of grocery orders cited in this opinion are for illustrative purposes. A more complete breakdown of weekly grocery orders for the Overland Dairy Stores for the years 1991 and 1992 are contained in the voluminous financial records exhibits filed by the parties.
[7] Although this Court has rejected that testimony of Jack Hunstein as regards certain real estate appraisal, the Court recognizes the fact that even considering the proffered real estate appraisal of $775,000.00, the Overland Dairy Stores still maintained a sizable deficit. All the real estate appraisal does is decrease the deficit; i.e. simply change the degree of insolvency. The fact remains that the stores were insolvent by November 1992 with their liabilities far exceeding their assets.
[8] This does not include any bar that might exist due to applicable statute(s) of limitations. The possible existence of such a bar will be addressed later in this opinion.
[9] Due to the paucity of caselaw analyzing and interpreting the Missouri Uniform Fraudulent Transfer Act, the Court reviewed the well-drafted and insightful article written by Francis X. Buckley entitled The Missouri Uniform Fraudulent Transfer Act, 50 J.Mo.B 89. Mr. Buckley's article was of great assistance to the Court in its understanding and application of the Act to the case at hand.
[10] 50 Mo.B. 89 (1994).
[11] As previously noted, the caselaw cited concerns the interpretation and application of repealed § 428.020 R.S.Mo. Plaintiff contends that § 428.024 does not impose a "clear and convincing evidence" burden of proof upon the plaintiff. Repealed § 428.020 did not explicitly impose a "clear and convincing evidence" burden upon a plaintiff, yet the Missouri courts consistently found that such a burden existed. The MoUFTA was enacted to replace § 428.020 and essentially codify in statutory form years of judicial analysis and application of fraudulent conveyance law. It is this Court's belief that the MoUFTA did not change the standard of proof required of plaintiffs pursuing a claim under fraudulent conveyance law in Missouri.
[12] These "badges of fraud" have been codified in § 428.024 R.S.Mo.
[13] The only evidence of a lease between Pennywise and defendants Max and Rose Rich is a renewal of an old lease wherein defendant Sanford Rich has altered, by hand, the expiration date of June 1, 1985 to June 1, 1990. Furthermore, the "lease" only bears defendant Sanford Rich's signature, not the signature of either one of his parents. What is particularly curious, is that the copies of the lease before the Court bear a notary's signature and attestment to the presence of signatures by Max and Rose; however, as stated before, there are no signatures by Max and Rose. Finally, there is no evidence before the Court of any lease or renewal of a lease past the expiration of June 1, 1990. Plaintiff's Exhibit 99; Defendants' Exhibit W.
[14] The Court's use of the term "asset" is not to be construed as that term is used under the MoUFTA. Instead, the Court uses the term to simply recognize a tangible item with significant value owned by one of the corporate debtors, in this case, Overland Dairy Market.
[15] The Court is well-aware that defendant Sanford Rich argued at trial that he and Koppermans are one and the same; therefore, the debt owed to Koppermans was really a debt owed to him. Thus, he was entitled to the $60,000.00 payment and to use it for the benefit of his parents. The Court is surprised that defendant Sanford Rich would advance such an argument because it places him in a very precarious position with the IRS. The $60,000.00 payment is not reflected anywhere on Koppermans or Sanford Rich's 1993 tax returns. In fact, not only does Koppermans take a tax benefit for listing the debt as uncollectible, but it appears, via Ruthann Ray's testimony, that defendant Sanford Rich also took a tax benefit for listing the debt as uncollectible on his 1993 tax return. Thus, not only is receipt of the payment not noted on any of the corporate tax returns or defendant Sanford Rich's tax return, but the debt is listed as uncollectible on both the corporate tax return for Koppermans and the individual tax return of Sanford Rich.
[16] Defendants Max and Rose Rich did not testify at trial.